No. 17-1640

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UPSTATE FOREVER AND SAVANNAH RIVERKEEPER,
Plaintiffs – Appellants,

v.

KINDER MORGAN ENERGY PARTNERS L.P. and
PLANTATION PIPE LINE COMPANY, INC.,
Defendants – Appellees,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS
## UPSTATE FOREVER AND SAVANNAH RIVERKEEPER

Frank S. Holleman, III
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516
Telephone: (919) 967-1450
Fax: (919) 929-9421
fholleman@selcnc.org

Christopher K. DeScherer
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403
Telephone: (843)720-5270
Fax: (843) 414-7039
cdescherer@selcsc.org

*Attorneys for Plaintiffs – Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __17-1640__    Caption: Upstate Forever v. Kinder Morgan Energy Partners

Pursuant to FRAP 26.1 and Local Rule 26.1,

Savannah Riverkeeper
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐ YES ☑ NO
      If yes, identify entity and nature of interest:


5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
      If yes, identify any trustee and the members of any creditors' committee:


Signature: s/ Frank S. Holleman, III                    Date: _____7/12/2017_____

Counsel for: Savannah Riverkeeper


## CERTIFICATE OF SERVICE
**************************

I certify that on _____7/12/2017_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:


s/ Frank S. Holleman, III                         _____7/12/2017_____
       (signature)                                              (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __17-1640__          Caption: _Upstate Forever v. Kinder Morgan Energy Partners_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Upstate Forever_____
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                                 ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(a)(2)(B))? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Frank S. Holleman, III          Date:    7/12/2017

Counsel for: Upstate Forever

# CERTIFICATE OF SERVICE
**************************

I certify that on    7/12/2017    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 s/ Frank S. Holleman, III                                         7/12/2017
          (signature)                                                  (date)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... i

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

    A.   Kinder Morgan's Pipeline Spill ................................................ 2

    B.   Kinder Morgan's Recovery Efforts and Corrective Action Plan ................................................................................ 4

    C.   Conservation Groups' Clean Water Act Lawsuit .................... 6

STANDARD OF REVIEW ................................................................... 8

SUMMARY OF THE ARGUMENT ..................................................... 8

ARGUMENT ...................................................................................... 10

    I.   Kinder Morgan's Discharges to Surface Waters from the Plantation Pipeline Point Source Are Prohibited by the Clean Water Act .................................................................. 10

        A. Kinder Morgan Continues to Be "In Violation Of" the Clean Water Act Even Though the Pipeline Has Been Patched .......................................................................... 11

        B. Kinder Morgan's Discharges to Surface Waters of the United States Need Not Be "Direct" and Are Not Nonpoint Source Pollution .............................................. 17

    II.  The Clean Water Act Prohibits Kinder Morgan's Discharges to Surface Waters of the United States Through Groundwater That Has a Direct Hydrologic Connection to the Surface Waters .......................................... 26

CONCLUSION .................................................................................. 37

STATEMENT REGARDING ORAL ARGUMENT ................................... 38

CERTIFICATE OF COMPLIANCE............................................................ 39

CERTIFICATE OF SERVICE .................................................................. 40

# TABLE OF AUTHORITIES

## Cases

*Adams v. Bain*,
  697 F.2d 1213 (4th Cir. 1982) ............................................................8

*Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*,
  No. 1:10–00084, 2011 WL 1357690 (M.D. Tenn. 2011)....................27

*Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*,
  25 F. Supp. 3d 798 (E.D.N.C. 2014) ................................................30

*Chevron U.S.A., Inc. v. Apex Oil Co.*,
  113 F. Supp. 3d 807 (D. Md. 2015)...................................................31

*Chevron v. Nat. Res. Def. Council*,
  467 U.S. 837 (1984)..........................................................................36

*Coldani v. Hamm*,
  No. 2:07-CV-0660, 2008 WL 4104292 (E.D. Cal. Aug. 16, 2007) ..................28

*Fishel v. Westinghouse Elec. Corp.*,
  640 F. Supp. 442 (M.D. Pa. 1986).....................................................24

*Friends of the Sakonnet v. Dutra*,
  738 F. Supp. 623 (D.R.I. 1990) .........................................................24

*Friends of Santa Fe Cty. v. LAC Minerals, Inc.*,
  892 F. Supp. 1333 (D.N.M. 1995).................................................27, 32

*Goldfarb v. Mayor of Baltimore*,
  791 F.3d 500 (4th Cir. 2015) .......................................................14, 15

*Greater Yellowstone Coal. v. Larson*,
  641 F. Supp. 2d 1120 (D. Idaho 2009) ..........................................28, 36

*Greenhouse v. MCG Capital Corp.*,
  392 F.3d 650 (4th Cir. 2004) ...............................................................8

*Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*,
  484 U.S. 49 (1987)..........................................................13, 14, 15, 16

*Hamker v. Diamond Chemical Co.*,
756 F.2d 392 (5th Cir. 1985) ...............................................................25

*Haw. Wildlife Fund v. Cty. of Maui*,
24 F. Supp. 3d 980 (2014) .................................................................35

*Haw. Wildlife Fund v. Cty. of Maui*,
No. 12-00198, 2015 WL 328227 (D. Haw. Jan. 23, 2015) ................27

*Hernandez v. Esso Std. Oil Co.*,
599 F. Supp. 2d 175 (D.P.R. 2009) ....................................................28

*Idaho Rural Council v. Bosma*,
143 F. Supp. 2d 1169 (D. Idaho 2001) ...............................................28

*Marrero Hernandez v. Esso Standard Oil Co. (Puerto Rico)*,
597 F. Supp. 2d 272 (D.P.R. 2009) ....................................................13

*McClellan Ecological Seepage Situation v. Weinberger*,
707 F. Supp. 1182 (E.D. Cal. 1988) ...................................................28

*Mut. Life Ins. Co. of N.Y. v. Mobil Corp.*,
No. CIVA96CV1781RSP/DNH, 1998 WL 160820 (N.D.N.Y. Mar.
31, 1998) .............................................................................................28

*Mylan Labs., Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) .................................................................8

*New York v. United States*,
620 F. Supp. 374 (E.D.N.Y. 1985) ....................................................28

*N. Cal. River Watch v. City of Healdsburg*,
496 F.3d 993 (9th Cir. 2007) ..............................................................27

*N. Cal. River Watch v. Mercer Fraser Co.*,
No. C-04-4620, 2005 WL 2122052 (N.D. Cal. Sept. 1, 2005).....................28, 29

*N.C. Wildlife Fed'n v. Woodbury*,
No. 87-584-Civ-5, 1989 WL 106517 (E.D.N.C. Apr. 25, 1989) .......................16

*Nw. Envtl. Def. Ctr. v. Brown*,
640 F.3d 1063 (9th Cir. 2011) ............................................................25

*Nw. Envtl. Def. Ctr. v. Grabhorn, Inc.*,
    No. CV-08-548-ST, 2009 WL 3672895 (D. Or. Oct. 30, 2009) ......................28

*O'Leary v. Moyer's Landfill*,
    523 F. Supp. 642 (E.D. Pa. 1981) ........................................................24

*Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*,
    No. 3:14-11333, 2015 WL 2144905 (S.D.W. Va. May 7, 2015) ......................30

*Philips v. Pitt Cty. Mem'l Hosp.*,
    572 F.3d 176 (4th Cir. 2009) ..............................................................4

*Quivira Mining Co. v. EPA*,
    765 F.2d 126 (10th Cir. 1985) ...........................................................31

*Rapanos v. United States*,
    547 U.S. 715 (2006)....................................................18, 19, 22, 23

*Raritan Baykeeper, Inc. v. NL Indus., Inc.*,
    No. 09-CV-4117 JAP, 2013 WL 103880 (D.N.J. Jan. 8, 2013).........................27

*Rice v. Harken Expl. Co.*,
    250 F.3d 264 (5th Cir. 2001) ..............................................................33

*Richmond, Fredericksburg & Potomac R.R. Co. v. United States*,
    945 F.2d 765 (4th Cir. 1991) ..............................................................8

*S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*,
    81 F. Supp. 3d 847 (N.D. Cal. 2015)....................................................27

*Sasser v. EPA*,
    990 F.2d 127 (4th Cir. 1993) ...........................................................16

*Sierra Club v. Colo. Ref. Co.*,
    838 F. Supp. 1428 (D. Colo. 1993)......................................................28

*Sierra Club v. El Paso Gold Mines, Inc.*,
    421 F.3d 1133 (10th Cir. 2005) .........................................................32

*Sierra Club v. Va. Elec. & Power Co.*,
    145 F. Supp. 3d 601 (E.D. Va. 2015) ....................................................30

iii

*Sierra Club v. Va. Elec. & Power Co.*,
   No. 2:15-CV-112, 2017 WL 1095039 (E.D. Va. Mar. 23, 2017) ...............29, 30

*Tri-Realty Co. v. Ursinus College*,
   2013 W.L. 6164092 (E.D. Pa. November 21, 2013) .........................................25

*United States v. Colonial Pipeline Co.*,
   242 F. Supp. 2d 1365 (N.D. Ga. 2002).............................................................10

*United States v. Cumberland Farms of Conn., Inc.*,
   647 F. Supp. 1166 (D. Mass. 1986)...................................................................17

*United States v. Deaton*,
   332 F.3d 698 (4th Cir. 2003) .............................................................................29

*United States v. Earth Sciences, Inc.*,
   599 F.2d 368 (10th Cir. 1979) ......................................................................23, 24

*United States v. Plaza Health Labs., Inc.*,
   3 F.3d 643 (2d Cir. 1993) ..................................................................................10

*United States v. Reaves*,
   923 F. Supp. 1530 (M.D. Fla. 1996)..................................................................17

*United States v. Texaco Expl. & Prod., Inc.*,
   No. 2:98-CV-0213S, 1999 WL 33597706 (D. Utah May 26, 1999).................10

*United States v. Tull*,
   615 F. Supp. 610 (E.D. Va. 1983) .....................................................................16

*U.S. Steel Corp. v. Train*,
   556 F.2d 822 (7th Cir. 1977) .............................................................................32

*Village of Oconomowoc Lake v. Dayton Hudson Corp.*,
   24 F.3d 962 (7th Cir. 1994) ...............................................................................33

*Wash. Wilderness Coal. v. Hecla Mining Co.*,
   870 F. Supp. 983 (E.D. Wash. 1994).................................................................28

*Waterkeeper All. Inc. v. EPA*,
   399 F.3d 486 (2d Cir. 2005) ..............................................................................27

iv

*Werlein v. United States*,
746 F. Supp. 887 (D. Minn. 1990)....................................................................13

*Williams Pipe Line Co. v. Bayer Corp.*,
964 F. Supp. 1300 (S.D. Iowa 1997).............................................................28

*Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*,
141 F. Supp. 3d 428 (M.D.N.C. 2015) ......................................................30, 31

**Statutes**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

33 U.S.C. §§ 1251-1376 ...................................................................................1

33 U.S.C. § 1251(a) .........................................................................................12

33 U.S.C. § 1311 .............................................................................................27

33 U.S.C. § 1362(12) ...........................................................................12, 21, 27

33 U.S.C. § 1362(14) .......................................................................................10

33 U.S.C. § 1365 .........................................................................................1, 11

42 U.S.C. § 6972(a)(1)(A)................................................................................14

**Regulations**

56 Fed. Reg. 64,876 (Dec. 12, 1991)...............................................................34

63 Fed. Reg. 7,858 (Feb. 17, 1998) .............................................................34-35

66 Fed. Reg. 2,960 (Jan. 12, 2001) .............................................................34, 36

68 Fed. Reg. 60,653 (Oct. 23, 2003)................................................................20

**Federal Rules of Procedure**

Federal Rule of Civil Procedure 12(b)...........................................................7, 8

**Legislative Materials**

H.R. Rep. No. 92–911 (1972) ...................................................................15

S. Rep. No. 92–414 (1971) .............................................................10, 15

S. Rep. No. 94–988 (1976) ..............................................................15

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting Plaintiffs,
   *Haw. Wildlife Fund v. Cty. of Maui*, No. 15-17447 (9th Cir.) .........22, 23, 34, 35

EPA Office of Water, *Nonpoint Source Guidance* (1987) .....................................20

EPA, *Response to Comments—Topic 10 Legal Analysis* (June 30,
   2015),
   https://19january2017snapshot.epa.gov/sites/production/files/2015-
   06/documents/cwr_response_to_comments_10_legal.pdf.................................35

EPA, *What is Nonpoint Source?*, https://www.epa.gov/nps/what-
   nonpoint-source...........................................................................................20

## JURISDICTIONAL STATEMENT

Appellants Upstate Forever and Savannah Riverkeeper (collectively "Conservation Groups") filed suit in the U.S. District Court for the District of South Carolina, challenging the ongoing, unlawful discharges of gasoline and petroleum contaminants by Appellees Kinder Morgan Energy Partners, L.P., and Plantation Pipe Line Company, Inc. (collectively "Kinder Morgan"), into waters of the United States in violation of the Clean Water Act ("CWA" or "Act"), 33 U.S.C. §§ 1251-1376. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365.

The District Court entered a final judgment dismissing the Conservation Groups' case on April 20, 2017. On May 18, 2017, the Groups timely filed notice of appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the continuing unpermitted discharge into jurisdictional waters from a pipeline point source is a violation of the Clean Water Act, when the original pipeline break has been patched and when gasoline was not spilled "directly" into surface waters.

2. Whether an unpermitted discharge of pollutants from a point source to jurisdictional surface waters through groundwater with a direct hydrological connection to those jurisdictional surface waters violates the

1

Clean Water Act.

## STATEMENT OF THE CASE

**A.    Kinder Morgan's Pipeline Spill**

In late 2014, residents of Belton, South Carolina, discovered that a gasoline pipeline owned and operated by Kinder Morgan had cracked and spilled what was later determined to be over 369,000 gallons (8,800 barrels) of gasoline.  App. 7 (Compl. ¶¶ 5-7).  Kinder Morgan never detected the spill; instead local residents noticed gasoline on the ground, dead plants, and a strong gasoline smell in the air. App. 7 (*Id.* ¶ 5).

This pipeline spill is one of the largest in South Carolina history.  App. 6 (*Id.* ¶ 1).  The flow of gasoline emerged from this large interstate pipeline that pushes over 20 million gallons of gasoline per day under pressure across 1,100 miles through the eastern United States.  App. 7 (*Id.* ¶ 4).  Although some 209,000 gallons of gasoline were recovered, over 160,000 gallons of gasoline were unrecovered in late 2016 when the Conservation Groups initiated this action.  App. 7 (*Id.* ¶¶ 8-9).

Because this pipeline is buried underground, the spill is moving through the earth and through groundwater, and emerges from the earth through seeps and through other conveyances that flow above ground.  App. 19 (*Id.* ¶¶ 54-55).  The subsurface petroleum flow was fourteen feet thick in the month after the spill was

2

discovered.  App. 7 (*Id.* ¶ 7).  Gasoline contaminants and gasoline several feet

thick continue to be detected in groundwater wells at the site.  App. 8 (*Id.* ¶¶ 13,

15-16).

The spill site is very close to two waterways and their wetlands.  The

pipeline break is 1,000 feet from Browns Creek and 400 feet from Cupboard

Creek.  App. 8 (*Id.* ¶ 11).  Both waterways are waters of the United States

protected by the Clean Water Act.  App. 19 (*Id.* ¶ 55).  The creeks are part of the

Savannah River Basin and flow through Anderson County, South Carolina.  Their

waters flow through Broadway Lake, Lake Secession, and Lake Russell, and

ultimately into the Savannah River.  App. 8 (*Id.* ¶¶ 11-12).

The waterways are downgradient of the pipeline break, meaning that they

are in the pathway of the groundwater flow from the break.  App. 8 (*Id.* ¶ 11).

Gasoline and gasoline pollutants have flowed and are flowing into Browns Creek

through the ground, on the surface of the ground, through groundwater, and

through seeps that emerge from the surface of the ground and flow into the

waterway.  App. 8-9, 19 (*Id.* ¶¶ 16-17, 54-55).  Kinder Morgan reports that, among

the conveyances from the spill site to Browns Creek, are two large unpermitted

streams of contaminated water: one 30 foot by 12 foot seep and one 12 foot by 12

foot seep that each "[i]mpact . . . surface water quality."  App. 288, 315-22 (Pls.'

Resp. in Opp'n to Defs.' Mot. to Dismiss at 3, Ex. A to Pls.' Resp. in Opp'n to

3

Defs.' Mot. to Dismiss).[1]

As soon as sampling began at the site in January of 2015, gasoline contamination was found in Browns Creek. App. 9 (Compl. ¶ 17). The toxic pollutants benzene, toluene, xylenes, naphthalene, and ethylbenzene have all been detected in the Creek. App. 9-10 (*Id.* ¶¶ 17, 21, 24).

Although the break in the pipeline has been plugged, the gasoline and gasoline pollutants from the pipeline spill continue to flow into the waterway; the flow of pollutants has not stopped. Indeed, testing performed in September of 2016 (over one and a half years after the spill was discovered) showed that the levels of gasoline pollutants in the waterway had increased between August and September of 2016, and were higher than in any other month throughout 2015 and 2016. App. 10 (*Id.* ¶ 24).[2] While any amount of unpermitted pollution violates the Clean Water Act, levels of gasoline pollutants in the waterway in 2016 far exceeded water quality standards. App. 9-10 (*Id.* ¶¶ 17, 21-22).

## B.    Kinder Morgan's Recovery Efforts and Corrective Action Plan

Kinder Morgan has undertaken some recovery efforts at the site with oversight by the South Carolina Department of Health and Environmental Control ("DHEC"). However, Kinder Morgan has repeatedly resisted requests from

---

[1] In reviewing a motion to dismiss, this Court may consider publicly available information. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[2] The data from September 2016 were the most recent available at the time the Complaint was filed.

DHEC.  App. 10, 14 (*Id.* ¶¶ 20, 35).  For example, in March 2016, DHEC instructed Kinder Morgan to test for gasoline pollution of Browns Creek at the location where the pollution is flowing into the waterway.  App. 9 (*Id.* ¶¶ 20).  Only in the late summer of 2016—months after DHEC issued its instruction and after the Conservation Groups began their own investigation—did Kinder Morgan start testing the waterway in the appropriate area.  App. 9-10 (*Id.* ¶ 21).  Samples from the new testing location contained gasoline pollution at hundreds of times the levels Kinder Morgan had previously reported.  App. 9-10 (*Id.* ¶¶ 20-24).

Kinder Morgan's recovery efforts have not prevented the continued and even increasing flow of gasoline pollutants into Browns Creek.  In the summer of 2016, the Conservation Groups visited the site and observed that, even after almost two years, the spill continued to impact the surrounding area.  The area reeked with gasoline odors.  Petroleum sheens were visible on Browns Creek.  Kinder Morgan had not attended to the booms it placed in Browns Creek to remove gasoline pollution; booms were darkened and saturated with contaminants and thus appeared to be of no further use in absorbing contamination.  The booms had not been replaced for such an extended period of time that plants were growing on them.  In addition, as set about above, almost two years after the spill was discovered, gasoline and gasoline pollutants continue to flow into Browns Creek; and contaminants continue to be detected at elevated levels.  App. 10-11 (*Id.* ¶¶ 24-

26).

Kinder Morgan was required by DHEC to prepare a corrective action plan for the spill by March of 2016.  Kinder Morgan failed to meet that deadline, and its proposed corrective action plan was submitted in September of 2016.  App. 14 (*Id.* ¶ 35).  Likewise, a comprehensive site assessment was delayed by six months. App. 14 (*Id.*).

Once Kinder Morgan's corrective action plan became public, it was widely criticized.  Anderson County passed a resolution objecting to it, and members of the public submitted critical comments.  App. 14 (*Id.* ¶ 36).  Among other things, Kinder Morgan proposed that it be allowed to continue discharging gasoline pollutants into the waterway for years to come and that it not be required to continue removing gasoline from the site.  App. 14 (*Id.* ¶ 37).  The plan also did not include adequate monitoring or an adequate groundwater treatment strategy to prevent the gasoline pollutants from reaching the waterway.  App. 14 (*Id.*).

C.    **Conservation Groups' Clean Water Act Lawsuit**

Following an investigation and review of Kinder Morgan's proposed corrective action plan, the Conservation Groups concluded that Kinder Morgan had not controlled its gasoline spill after almost two years and that future recovery and remediation efforts would not be effective.  To protect the waterways from the continuing discharge of gasoline and gasoline pollutants, the Conservation Groups

6

initiated this Clean Water Act enforcement action.  On October 24, 2016, they sent the required 60-day notice to Kinder Morgan, DHEC, and the U.S. Environmental Protection Agency ("EPA").  On December 28, 2016, they filed this action, seeking effective action to stop the continuing discharge of gasoline and gasoline pollutants into the waterways, as well as appropriate penalties.

The Complaint alleges unpermitted discharges of gasoline and gasoline pollutants to waters of the United States from the pipeline over and through the land and through flows, seeps, and fissures to waters of the United States, and by pollution of surface water via groundwater that has a direct hydrologic connection to the surface water.  App. 19, 22-23 (*Id.* ¶¶ 54, 64-70).

On February 17, 2017, Kinder Morgan filed a motion to dismiss under Federal Rule of Civil Procedure 12(b) seeking a dismissal of the Conservation Groups' Complaint for lack of subject matter jurisdiction and failure to state a claim for relief.  The District Court granted this motion on April 20, 2016, making the following rulings that the Conservation Groups present for review: 1) Kinder Morgan's pipeline is not a point source because the pipeline has been repaired, App. 411, 416 (District Ct. Op. at 2, 7), and because the pipeline did not directly discharge pollutants into navigable waters and thus the gasoline pollution of the creek, which moves a short distance through and over the earth and through groundwater to the creek, is nonpoint source pollution, App. 417-19 (District Ct.

Op. at 8-10); and 2) the Clean Water Act does not protect against pollution
discharges from a point source to surrounding surface waters conveyed by
groundwater that has a direct hydrological connection to the surface waters, App.
421-25 (District Ct. Op. at 12-16).

## STANDARD OF REVIEW

Dismissals under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) are
reviewed *de novo*. *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 (4th Cir.
2004); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d
765, 768-69 (4th Cir. 1991). The Court must accept as true all well-pleaded
allegations and view the complaint in the light most favorable to the plaintiff.
*Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *Adams v. Bain*,
697 F.2d 1213, 1219 (4th Cir. 1982). Dismissal should not be granted "unless it
appears certain that the plaintiff can prove no set of facts which would support its
claim and would entitle it to relief." *Mylan Labs., Inc.*, 7 F.3d at 1134; *see Adams*,
697 F.2d at 1219.

## SUMMARY OF THE ARGUMENT

The District Court held that the gasoline pipeline is not a point source
because the pipeline has been patched and because the gasoline spill flows across
and through 1,000 feet of land and groundwater before it reaches the waterway.
However, Kinder Morgan remains "in violation of" the Clean Water Act as long as

its gasoline discharge continues to flow into the waterway, even if the pipe itself has been plugged.  In addition, the language of the Clean Water Act does not require a "direct" discharge, but rather any unpermitted "discharge" and "addition of any pollutant" to United States waters.  Nor, as the District Court held, is this nonpoint source pollution.  This is a historic spill of gasoline from one pipeline to a nearby waterway; it is not an example of the diffuse flow of pollutants carried by rainfall or storm water.  The District Court's rewriting of the Act would allow rampant pollution as long as the point source was located some short distance from the surface waters.

Likewise, the Clean Water Act covers the discharge from a point source of pollutants conveyed to surface water by groundwater that has a direct hydrologic connection to the surface water.  The language of the Act itself covers such an "addition of any pollutant" to surface waters, and the overwhelming majority of courts, the EPA, and the U.S. Department of Justice have found that the Clean Water Act does and must cover such pollution.  It would undercut the purpose of the Act to read it to impose liability on a polluter who discharges pollutants from a pipe running directly to the riverbank but not a polluter who dumps the same pollutants short of the river and allows the pollutants to flow into the river through groundwater with a direct hydrological connection.

## ARGUMENT

I.    **Kinder Morgan's Discharges to Surface Waters from the Plantation Pipeline Point Source Are Prohibited by the Clean Water Act.**

Without any doubt, in this case there is a point source for the pollution that is flowing into the waterway.  The point source is the Kinder Morgan gasoline pipeline.  It broke, and over 369,000 gallons of gasoline spilled out.  Pollutants from the pipeline have been discharging into Browns Creek since at least January 2015 and continue to discharge into it today.

The District Court itself recognized that a pipeline can be a point source, as courts have widely held.  App. 416 (District Ct. Op. at 7).[3]  Indeed, the Kinder Morgan pipeline falls squarely within the Clean Water Act's definition of a point source: "any discernible, *confined and discrete conveyance*, including but not limited to *any pipe*, ditch, channel, tunnel, *conduit*, well, discrete fissure . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14) (emphases added); *see also* S. Rep. No. 92–414, at 51 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3,668, 3,717 (pipelines are clearly point sources; the EPA

---

[3] *See, e.g.*, *United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 651 (2d Cir. 1993) ("the classic point source is something like a pipe."); *United States v. Colonial Pipeline Co.*, 242 F. Supp. 2d 1365, 1368 (N.D. Ga. 2002) (presuming that petroleum pipeline is a point source); *United States v. Texaco Expl. & Prod., Inc.*, No. 2:98-CV-0213S, 1999 WL 33597706, at *2 (D. Utah May 26, 1999) (denying motion to dismiss where government alleged that "[e]ach of [the defendants' oil pipeline] spills constitute a discharge of 'pollutants' from a 'point source' not authorized by a permit in violation of the broad prohibition in [Clean Water Act] Section 301(a)").

10

Administrator also should "not ignore discharges resulting from point sources other than pipelines or similar conduits").

However, the District Court dismissed the Kinder Morgan pipeline as a point source for two reasons: a) the leak in the pipeline had been plugged, and b) gasoline was not spilled "directly" into the waterway, but instead flowed over and through a short space of land and groundwater before reaching it.

### A. Kinder Morgan Continues to Be "In Violation Of" the Clean Water Act Even Though the Pipeline Has Been Patched.

The District Court concluded that the gasoline pipeline was no longer a point source because the leak in the pipe had been plugged. App. 417 (District Ct. Op. at 8). But even if the point source is no longer releasing gasoline, as long as the pollution discharged from the point source continues to flow into the waterway, Kinder Morgan remains in violation of the Clean Water Act. The issue is not whether the point source has been blocked, but whether the discharge from the point source continues to enter the waterway.

The District Court's ruling is squarely contrary to the plain language of the Clean Water Act. The Clean Water Act, like other federal anti-pollution statutes, authorizes a citizen enforcement action against any person who is alleged to be "in violation of" the Act's standards and limitations. 33 U.S.C. § 1365(a)(1). The Clean Water Act does ***not*** provide, as the District Court ruled, that a polluter can be sued only if it is alleged to be "continuing to discharge from the point source"

11

or if "the point source continues to malfunction." The violation is the unpermitted

discharge, and the Clean Water Act defines a "discharge" to be "***any addition of***

***any pollutant to navigable waters***" from any point source. 33 U.S.C. § 1362(12)

(emphasis added).

The Clean Water Act violation, then, is not the malfunction of the point

source or the continued flow out of the point source but the "addition of any

pollutant to" the water of the United States. Kinder Morgan continues to be "in

violation of" the Clean Water Act as long as the ***violation***—the unpermitted

addition of pollutants to the waterway—continues.

The District Court's ruling ignores the express purposes of the Clean Water

Act. The Act seeks to "restore and maintain the chemical, physical, and biological

integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that

objective, Congress set the national goal that "the discharge of pollutants into the

navigable waters be eliminated." *Id.* §1251(a)(1). Thus, the Clean Water Act is

expressly written to protect the "Nation's waters" and to eliminate "the discharge

of pollutants."

The Clean Water Act's objective is not the repair of faulty pipes or other

point sources. For example, a broken point source that discharges and is not

repaired is not in violation of the Act unless its polluting discharge reaches a water

of the United States. If Kinder Morgan had stopped the flow of its gasoline

12

pollution into the waterway by other means, it would not have continued to violate the Act even if its pipe had not been fixed.  Likewise, the repair of a broken point source is irrelevant to the Act's purpose if the polluting discharge continues to reach and add pollutants to the Nation's waters.  *See, e.g.*, *Marrero Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 597 F. Supp. 2d 272, 276, 286 (D.P.R. 2009) (failure to take remedial measures for leaks emanating from now-removed underground storage tanks site is a "continuing violation," since "it is not the physical act of discharging toxic materials that gives rise to citizen standing under the [Act], but the consequences of the discharge in terms of lasting environmental damage").

> As one court has explained:
>
> Clearly, the purpose of the Clean Water Act is to prevent the pollution of water.  Where a polluter dumps toxic substances directly into a waterway, the damage is done, and that violation is 'wholly past' under *Gwaltney* if plaintiffs later file suit.  Here, though, there is toxic waste that has not yet reached a waterway, but is being introduced into the waterway over time.  This is an 'ongoing' pollution of a waterway.  ***There are toxic substances at the Trio Solvents site that may yet be prevented from entering the water.***  This is consistent with the goal of the CWA, and with the reasoning of *Gwaltney.*

*Werlein v. United States*, 746 F. Supp. 887, 897 (D. Minn. 1990), *vacated in part on other grounds,* 793 F. Supp. 898 (D. Minn. 1992) (emphasis added).  In *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, the Supreme Court ruled that a violation of an NPDES permit limit on effluent discharges was "wholly

13

past" when the discharges were no longer continuing when the Complaint was filed, and therefore not cognizable under the Clean Water Act's citizen suit provision. 484 U.S. 49, 57 (1987). The holding of *Gwaltney* does not limit citizen suit jurisdiction where the ongoing discharge and flow of pollutants from a point source continues to enter a water of the United States.

The District Court's decision is also squarely contrary to the holding of this Court in *Goldfarb v. Mayor of Baltimore*, 791 F.3d 500 (4th Cir. 2015). This Court has applied the same "in violation of" language contained in the Clean Water Act and enforced federal anti-pollution laws to protect the nation's waters from ongoing contamination, even when the initial polluting activity had stopped. This Court explained that the statutory phrase "to be in violation of":

> [D]oes not necessarily require that a defendant be currently engaged in the activity causing the continuous or ongoing violation. Rather, the proper inquiry centers on "whether the defendant's actions—past or present—cause an ongoing violation" . . . . In other words, although a defendant's ***conduct*** that is causing a ***violation*** may have ceased in the past . . . what is relevant is that the ***violation*** is continuous or ongoing.

791 F.3d at 513 (interpreting the Resource Conservation and Recovery Act ("RCRA")) (emphases in original) (internal citations omitted).

*Goldfarb* addressed RCRA, but, as this Court pointed out, the "in violation of" language in the RCRA citizen suit provision at 42 U.S.C. § 6972(a)(1)(A) is "identical" to the same controlling provision of the Clean Water Act. *Id*. (citing

*Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987)).

Indeed, when Congress enacted the "in violation of" language of RCRA that the

Court applied in *Goldfarb*, Congress simply incorporated the "in violation of"

language of the Clean Water Act. *See* S. Rep. No. 94–988, at 17-18 (1976) (Pub.

Works Comm. Rep.) ("Under new section 215 anyone may initiate a civil suit

against any person who is alleged to be in violation of any permit, standard,

regulation, condition, requirement, or order . . . The Committee drew on the similar

provisions of the Clean Air Act of 1970 and the Federal Water Pollution Control

Act Amendments of 1972.").

Both the RCRA and Clean Water Act citizen suit provisions share a

common ancestor in the Clean Air Act citizen suit provision. S. Rep. No. 92–414,

at 79 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3,668, 3,745 (citizen participation

under the Clean Water Act is "modeled on the provision enacted in the Clean Air

Amendments of 1970"); H.R. Rep. No. 92–911, at 133 (1972) ("Section 505 [of

the Clean Water Act] closely follows the concepts utilized in section 304 of the

Clean Air Act").

The Supreme Court in *Gwaltney of Smithfield v. Chesapeake Bay

Foundation, Inc.* explained the purpose of the "in violation of" language contained

in all three keystone federal environmental statutes:

> Congress' acknowledgment of this connection [between the Clean
> Water Act and Clean Air Act provisions] suggests that the identity of

15

the "alleged to be in violation" language of the citizen suit provisions
of the two Acts is not accidental; rather, the two provisions *share the
common central purpose of permitting citizens to abate pollution*
when the government cannot or will not command compliance. This
understanding of the "alleged to be in violation" language as a
statutory term of art rather than a mere stylistic infelicity is reinforced
by the consistent adherence in the Senate and House Reports to the
precise statutory formulation. *See, e.g.*, S. Conf. Rep. No. 92–1236, p.
145 (1972), 1 Leg. Hist. 328; H.R. Rep. No. 92–911, . . . at 133, 1
Leg. Hist. 820; S. Rep. No. 92–414, . . . at 79, 2 Leg. Hist. 1497.

484 U.S. 49, 62 (emphasis added).

In applying another section of the Clean Water Act, this Court and courts

around the country have likewise repeatedly held that a polluter who illegally

discharges fill into a water of the United States continues to be "in violation of" the

Clean Water Act *even though the act of filling had ceased*, due to the continued

presence of fill in the waterway.

Under the Clean Water Act, discharges of fill material to wetlands are

"continuing" even when fill activities have stopped because "it is not the physical

act of discharging dredge wastes itself that leads to the injury giving rise to citizen

standing, but the *consequences* of the discharge in terms of lasting environmental

degradation." *N.C. Wildlife Fed'n v. Woodbury*, No. 87-584-Civ-5, 1989 WL

106517, at *2–*3 (E.D.N.C. Apr. 25, 1989) (emphasis in original). In other words,

"[e]ach day the pollutant remains in the wetlands without a permit constitutes an

additional day of violation" of the Clean Water Act. *Sasser v. EPA*, 990 F.2d 127,

129 (4th Cir. 1993); *see also United States v. Tull*, 615 F. Supp. 610, 626 (E.D. Va.

16

1983), *reversed on other grounds*, 481 U.S. 412 (1987) (noting that defendant allowed illegal fill to remain in wetlands in assessment of Clean Water Act penalty); *United States v. Cumberland Farms of Conn., Inc.*, 647 F. Supp. 1166, 1183 (D. Mass. 1986), *aff'd*, 826 F.2d 1151 (1st Cir. 1987); *United States v. Reaves*, 923 F. Supp. 1530, 1534 (M.D. Fla. 1996).

The District Court wrongly concluded that the Clean Water Act ceased to apply once Kinder Morgan fixed its pipe. But, as the facts clearly show, fixing the pipe did not stop the continuing water pollution. More than two years after the spill and the repair of the pipe, Kinder Morgan's unpermitted discharge of pollutants continues to flow into the waterway. Kinder Morgan must employ effective means to stop the pollution—not simply fix the pipe—so that it is no longer adding pollutants to the waterway.

## B.    Kinder Morgan's Discharges to Surface Waters of the United States Need Not Be "Direct" and Are Not Nonpoint Source Pollution.

The District Court also concluded that the pipeline could not be a point source because the gasoline was not spilled "directly" into the waterway but instead flowed through, under, and across a short space of land before reaching the waterway. App. 416-18 (District Ct. Op. at 7-9).[4]

---

[4] The District Court stated that "the Plaintiffs have failed to allege any facts to support the position that the pipeline discharged petroleum ***directly*** into navigable waters," App. 416 (District Ct. Op. at 7) (emphasis added), and that "[t]o find that

But there is nothing in the Clean Water Act or in the precedents interpreting it that requires that a point source discharge directly into a waterway. The purpose of the Clean Water Act is to protect the Nation's waterways. The clean waters of the Nation are equally fouled when pollution is discharged directly into the water and when pollution travels a short distance through or over the surface of the earth.

The District Court based its decision in part upon a misunderstanding of Justice Scalia's opinion for four Justices in *Rapanos v. United States*, 547 U.S. 715 (2006). In that case, Justice Scalia's opinion rejected the position of the United States that "dry arroyos in the middle of the desert" and "drainage ditches" could be considered waters of the United States, and characterized this interpretation as a "Land is Waters" approach to defining a water of the United States. 547 U.S. at 734. The District Court confused that argument of the United States in *Rapanos* with Kinder Morgan's discharge of gasoline into Browns Creek, and labeled the Conservation Groups' position as also a "Land is Waters" approach. App. 417 (District Ct. Op. at 8).

However, that label has no application here. In this case, there is no question that a water of the United States, Browns Creek, is being polluted by Kinder Morgan's gasoline discharge. The Conservation Groups have never

---

the pipeline *directly* discharged pollutants into navigable waters under the facts alleged would result in the CWA applying to every discharge into the soil and groundwater no matter its location[,]" App. 417 (*id.* at 8) (emphasis added).

18

contended that the flow and discharge of those pollutants through and over the land to Brown Creeks is a water of the United States. That flow of pollutants is not a water of the United States but a ***discharge to*** a water of the United States.

The District Court also failed to acknowledge that Justice Kennedy's concurring opinion provided the essential fifth vote for the majority in *Rapanos*. Justice Kennedy's opinion expressly rejected Justice Scalia's analysis, pointing out, among other things, that some waterways are dry part of the year but flow vigorously at other times, thus invalidating the "Land is Waters" critique. 547 U.S. at 769-770. Justice Kennedy and a majority of the Court (including the four dissenters) rejected the analogy that the District Court embraced.

The District Court also relied upon a related conclusion that this pipeline spill is nonpoint source pollution because it did not directly discharge into the water but instead flowed under and over the surface of the ground and through groundwater to the waterway. App. 417-20 (District Ct. Op. at 8-11). This conclusion also is contrary to the facts of this case and the express language of the Clean Water Act.

At the outset, Kinder Morgan's gasoline spill is the polar opposite of diffuse nonpoint source pollution. Kinder Morgan's gasoline pipeline broke in a discrete location (at a broken patch) and spilled hundreds of thousands of gallons of gasoline from the pipeline just 1,000 feet uphill from Browns Creek. That

19

particular spill of gasoline flowed and is still flowing into Browns Creek. The Complaint alleges, and there is no dispute, that the pollution of the waterway by gasoline and gasoline contaminants is from this specific spill from this specific pipe.

The EPA sets out that nonpoint source pollution:

> [I]s caused by diffuse sources that are not regulated as point sources and normally is associated with agricultural, silvicultural and urban runoff, runoff from construction activities, etc. Such pollution results in the human-made or human-induced alteration of the chemical, physical, biological, and radiological integrity of water. In practical terms, *nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe)* but generally results from land runoff, precipitation, atmospheric deposition, or percolation.

EPA Office of Water, *Nonpoint Source Guidance* 3 (1987) (emphasis added).

The EPA has also explained that "[n]onpoint source pollution is caused by rainfall or snowmelt moving over and through the ground and carrying natural and human-made pollutants into lakes, rivers, streams, wetlands, estuaries, other coastal waters, and ground water." Nonpoint Source Program and Grants Guidelines for States and Territories, 68 Fed. Reg. 60,653, 60,655 (Oct. 23, 2003); *see also* EPA, *What is Nonpoint Source?*, https://www.epa.gov/nps/what-nonpoint-source (last visited July 3, 2017) ("Nonpoint source [] pollution . . . comes from many diffuse sources . . . [and] is caused by rainfall or snowmelt moving over and

through the ground.").

Kinder Morgan's gasoline spill pollution is not a case of "diffuse sources," or of "agricultural, silvicultural, or urban runoff," or of "land runoff, precipitation, atmospheric deposition, or percolation." Nor is it caused by "rainfall or snowmelt moving over and through the ground." Instead, Kinder Morgan's pollution of the waterway is the result of a "discharge at a specific, single location (such as a single pipe)": a flow of over 369,000 gallons of gasoline being transported across the country under pressure from a crack in a specific interstate gasoline pipeline, a large pipeline that carries 20 million gallons of gasoline per day. The pollution is moving through and over a short space of land and groundwater, but the pollution is the result of a *specific* event from a *specific* source owned and operated by a *specific* entity. In addition, the pollution of Brown's Creek has been continuous and is not reliant on rainfall or snowmelt. In no sense is this pollution nonpoint source pollution.

There is also no basis in the Clean Water Act itself for excluding Kinder Morgan's gasoline spill from the reach of the Act. The Clean Water Act defines a "discharge of pollutants" to be "any addition of any pollutant to navigable waters" from any point source. 33 U.S.C. § 1362(12). Contrary to the position of the District Court, and as the EPA and the U.S. Department of Justice have explained, the Clean Water Act's "language prohibiting 'any addition of any pollutant to

navigable waters from any point source' does not limit liability only to discharges of pollutants ***directly*** to navigable waters."  Brief for the United States as Amicus Curiae Supporting Plaintiffs, *Haw. Wildlife Fund v. Cty. of Maui*, No. 15-17447, at 10 (9th Cir.) (filed June 2, 2016) (emphasis in original).[5]

If the test created by the District Court were the law, then dischargers could easily avoid the Clean Water Act and its protections by simply pulling their pipes, ditches, and other discharge points back from the waterway and allowing the discharge to flow over or through the land a short distance into the waterway—in this case 1,000 feet or less.  Or, they could inject their discharges into the ground a short distance from the waterway itself and thereby avoid the Clean Water Act even if the pollution bubbled up out of the ground and flowed immediately into navigable waters.  In either instance, the result of the discharge is the same as if the pipe, ditch, or other discharge point reached the edge of the waterway itself.  There is no basis in the Clean Water Act or in logic to make the distinction that the District Court authored.

In this respect, the District Court overlooked the statement in Justice Scalia's *Rapanos* opinion that is relevant to this case.  In fact, Justice Scalia's opinion expressly refused to endorse the District Court's conclusion that the Clean Water

---

[5] Since this brief sets out the position of the EPA and Department of Justice in a case presenting some of the same issues before this Court, the Conservation Groups are moving to file this brief as Exhibit A for the Court's convenience.

Act does not apply if pollution flows over and through land to a water of the United States: "The [Clean Water] Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'" 547 U.S. at 743 (citing 33 U.S.C. § 1362(12)(A) and §1311(a)) (emphases in original).

As the U.S. Department of Justice and the Environmental Protection Agency recently told another U.S. Court of Appeals, "courts have interpreted the term 'discharge of a pollutant' to cover discharges over the ground and by other means" including transmission through groundwater. Brief for the United States as Amicus Curiae Supporting Plaintiffs, *Haw. Wildlife Fund v. Cty. of Maui*, No. 15-17447, at 10 (9th Cir.) (filed June 2, 2016).

For example, in *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir. 1979), a mine owner operated a closed sump pool that—like Kinder Morgan's pipeline—was not designed to discharge pollutants. However, as a result of snowfall melt, the pool overflowed, and pollutants flowed over the land and through groundwater seeps into a neighboring creek. *Id*. at 370-372. The mining company—like Kinder Morgan—argued that this accidental spill was not covered by the Clean Water Act but instead was nonpoint source pollution. The Court of Appeals rejected that argument, holding that "the escape of liquid from the confined system is a point source" and that "[a]lthough the source of the excess

23

liquid is rainfall or snowmelt, this is not the kind of general runoff considered to be from nonpoint sources under the [Clean Water Act]." *Id*. at 374. The Court also held that since the Clean Water Act is a strict liability statute, it was immaterial that the discharge of pollutants was unintentional. *Id*.

Likewise, in *Friends of the Sakonnet v. Dutra*, 738 F. Supp. 623 (D.R.I. 1990), a defective septic system allowed sewage to flow across 250 feet of land to a river. The Court found a violation of the Clean Water Act, noting that courts "have broadly interpreted the term point source" to reach "all pollution that comes from a confined system," even though "there was no intentional pollution" and "there were no pipes or manmade devices that carried the pollutants from the confined system or collection point to the navigable waters." *Id*. at 629-630.

In *O'Leary v. Moyer's Landfill*, 523 F. Supp. 642 (E.D. Pa. 1981), citizens sued because a landfill was leaking pollutants into a creek. Like the District Court found in this case, the landfill owner argued that the Clean Water Act did not apply because the landfill was not discharging directly into the creek and was not connected to the creek by pipes or a tributary. *Id*. at 647. The Court in O'Leary rejected that argument "as frivolous," holding that "there is no requirement that the point source need be adjacent to the waters it pollutes." *Id*.; *see also Fishel v. Westinghouse Elec. Corp*., 640 F. Supp. 442, 448 (M.D. Pa. 1986) (pollution overflows from a waste lagoon that traveled across land were "discharges of

unchannelled and uncollected surface waste from the lagoon into the stream" that violated the Clean Water Act).

In the course of its decision, the District Court misread and misapplied a number of cases, in addition to Justice Scalia's *Rapanos* opinion. *Hamker v. Diamond Chemical Co*., 756 F.2d 392, 397 (5th Cir. 1985), did not involve a continuing discharge of pollutants from a pipeline spill into waters of the United States; instead, the plaintiffs alleged only that oil "is leaking into ground water and has left lasting damage to grasslands" and did "not allege a continuing discharge," as does the Conservation Groups' Complaint. The unreported decision in *Tri-Realty Co. v. Ursinus College*, 2013 W.L. 6164092 (E.D. Pa. November 21, 2013), addressed soil contamination that "five or six years later" migrated to the surface and then was washed into a waterway—not a spill of hundreds of thousands of gallons of gasoline that immediately flowed and continues to flow into a very nearby water of the United States.

The District Court also cites *Northwest Environmental Defense Center v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1326 (2013), for the unremarkable proposition that the Clean Water Act does not reach natural storm water runoff—a proposition that has no application to the flow of a 14-foot thick flow of 369,000 gallons of gasoline downhill to a nearby water of the United States.

25

The District Court made the following mistakes: a) it eliminated the Clean Water Act's protection of the Nation's waters once a malfunctioning piece of equipment is fixed, even though the addition of pollutants in violation of the Act continues; and b) it rewrote the Act to require a discharge directly into a water of the United States, even when a discharge is flowing over and through land and groundwater to a water of the United States and thereby mischaracterized as nonpoint source pollution a large, historic spill of gasoline from a single break in a large interstate pipeline into a waterway. For these reasons, the District Court's decision should be reversed.[6]

## II.    The Clean Water Act Prohibits Kinder Morgan's Discharges to Surface Waters of the United States Through Groundwater that Has a Direct Hydrologic Connection to the Surface Waters.

Contrary to the language of the Clean Water Act and the basic purposes of the Act, the District Court held that the Clean Water Act does not encompass the unpermitted discharge of pollutants from a point source to surface waters of the United States via groundwater that has a direct hydrologic connection to the surface waters. App. 421-25 (District Ct. Op. at 12-16). This position of the District Court rejects the rulings of an overwhelming majority of courts across the

---

[6] The Conservation Groups' Complaint also alleges that the spill site and seeps, flows, fissures, and channels are point sources. App. 22 (Compl. ¶ 65). Since the pipeline itself was acknowledged by the District Court to be a point source and since the District Court's reasons for discarding that fact are invalid, the Conservation Groups do not believe it is necessary for the Court to address the other alleged point sources.

United States and in the Fourth Circuit, as well as the long-held interpretation of

the Clean Water Act by the EPA and the Department of Justice.

As noted above, when Congress prohibited the unpermitted "discharge of

any pollutant," it defined this key phrase broadly as "any addition of any pollutant

to navigable waters from any point source," and did not limit it to only direct

discharges to navigable waters.  33 U.S.C. §§ 1311, 1362(12)(A).  For this reason,

"[m]ost courts" that have considered the issue have held that unpermitted

discharges to surface waters through hydrologically connected groundwaters are

prohibited under Section 301 of the Clean Water Act.  *Friends of Santa Fe Cty. v.

LAC Minerals, Inc.*, 892 F. Supp. 1333, 1358 (D.N.M. 1995).  In this footnote, the

Conservation Groups cite some of the vast number of cases from across the

country that have so held.[7]  Courts over the last three decades came to this decision

---

[7] *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir.
2007) (Clean Water Act coverage based on hydrologic connection); *Waterkeeper
All. Inc. v. EPA*, 399 F.3d 486, 515 (2d Cir. 2005) (upholding EPA's case-by-case
approach to regulating feedlot pollutant discharges to surface waters through
connected groundwater); *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp.
3d 847, 863 (N.D. Cal. 2015); *Haw. Wildlife Fund v. Cty. of Maui*, No. CIV. 12-
00198 SOM/BM, 2015 WL 328227, at *5 (D. Haw. Jan. 23, 2015) ("exempting
discharges of pollutants from a point source merely because the polluter is lucky
[or clever] enough to have a nonpoint source at the tail end of a pathway to
navigable waters would undermine the very purpose of the Clean Water Act");
*Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-CV-4117 JAP, 2013 WL
103880, at *15 (D.N.J. Jan. 8, 2013) (Clean Water Act covers hydrologically
connected groundwater); *Ass'n Concerned Over Res. & Nature, Inc. v. Tenn.
Aluminum Processors, Inc.*, No. 1:10–00084, 2011 WL 1357690, at *17-*18 (M.D.
Tenn. 2011) ("groundwater is subject to the CWA provided an impact [sic] on

federal waters"); *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1138 (D. Idaho 2009) ("there is little dispute that if the ground water is hydrologically connected to surface water, it can be subject to" the Clean Water Act); *Nw. Envtl. Def. Ctr. v. Grabhorn, Inc.*, No. CV-08-548-ST, 2009 WL 3672895, at *11 (D. Or. Oct. 30, 2009) ("In light of the EPA's regulatory pronouncements, this court concludes that . . . the CWA covers discharges to navigable surface waters via hydrologically connected groundwater."); *Hernandez v. Esso Std. Oil Co.*, 599 F. Supp. 2d 175, 181 (D.P.R. 2009) ("CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States."); *Coldani v. Hamm*, No. 2:07-CV-0660, 2008 WL 4104292, at *7-*8 (E.D. Cal. Aug. 16, 2007) (pollution of groundwater that is hydrologically connected to navigable surface waters falls within the purview of the Clean Water Act); *N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620, 2005 WL 2122052, at *3 (N.D. Cal. Sept. 1, 2005), *aff'd*, 496 F.3d 993 ("the regulations of the CWA do encompass the discharge of pollutants from wastewater basins to navigable waters via connecting groundwaters"); *Idaho Rural Council v. Bosma*, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) ("CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); *Mut. Life Ins. Co. of N.Y. v. Mobil Corp.*, No. CIVA96CV1781RSP/DNH, 1998 WL 160820, at *2-*3 (N.D.N.Y. Mar. 31, 1998) (denying motion to dismiss Clean Water Act claim—plaintiff's complaint alleged that groundwater contaminated by underground storage tank failures three years prior was hydrologically connected to navigable waters); *Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1319–20 (S.D. Iowa 1997) (where groundwater flows toward surface waters, there is "more than the mere possibility that pollutants discharged into groundwater will enter 'waters of the United States,'" and discharge of petroleum into this hydrologically-connected groundwater violates the Clean Water Act); *Wash. Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 990 (E.D. Wash. 1994) ("since the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation"); *Sierra Club v. Colo. Ref. Co.*, 838 F. Supp. 1428, 1434 (D. Colo. 1993) ("discharge of any pollutant into 'navigable waters' includes such discharge which reaches 'navigable waters' through groundwater"); *McClellan Ecological Seepage Situation v. Weinberger*, 707 F. Supp. 1182, 1195–96 (E.D. Cal. 1988) (Clean Water Act covers groundwater "naturally connected to surface waters that constitute 'navigable waters'"), *vacated on other grounds*, 47 F.3d 325 (9th Cir. 1995); *New York v. United States*, 620 F. Supp. 374, 381 (E.D.N.Y. 1985) (groundwater discharges threatening navigable waters subject to Clean Water Act).

because it is most consistent with the Clean Water Act's language and purpose. "Congress intended the [Act] to protect the water quality of the nation's surface water. Where the facts show a direct hydrological connection between ground water and surface water, that goal would be defeated if the [Act]'s jurisdiction did not extend to discharges to that groundwater." *Sierra Club v. Va. Elec. & Power Co.*, No. 2:15-CV-112, 2017 WL 1095039, at *6 (E.D. Va. Mar. 23, 2017). As one court put it, to hold otherwise defies logic and might even encourage dischargers to alter pollution control systems to avoid Clean Water Act liability:

> [I]t would hardly make sense for the [Clean Water Act] to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.

*N. Cal. River Watch v. Mercer Fraser Co.*, No. C-04-4620, 2005 WL 2122052, *2 (N.D. Cal. Sept. 1, 2005).

The Fourth Circuit has not decided whether the Clean Water Act protects against unpermitted pollution conveyed to surface waters by directly connected groundwater. But this Court has recognized that "[t]he power over navigable waters also carries with it the authority to regulate nonnavigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters." *United States v. Deaton*, 332 F.3d 698, 707 (4th Cir. 2003).

In addition, on four occasions United States District Courts in the Fourth

Circuit—the majority to have considered the issue—have expressly held that the Clean Water Act covers pollution of surface waters via hydrologically connected groundwater. *Sierra Club v. Va. Elec. & Power Co.*, No. 2:15-CV-112, 2017 WL 1095039, at *6 (E.D. Va. Mar. 23, 2017) ("The [Clean Water Act] regulates the discharge of arsenic into navigable surface waters through hydrologically connected groundwater."); *Sierra Club v. Va. Elec. & Power Co.*, 145 F. Supp. 3d 601, 607 (E.D. Va. 2015); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 445 (M.D.N.C. 2015) ("This Court agrees with the line of cases affirming [Clean Water Act] jurisdiction over the discharge of pollutants to navigable surface waters via hydrologically connected groundwater, which serves as a conduit between the point source and the navigable waters."); *Ohio Valley Envtl. Coal. Inc. v. Pocahontas Land Corp.*, No. 3:14-11333, 2015 WL 2144905, at *8 (S.D.W. Va. May 7, 2015).

Other than the decision of the District Court in this case, the sole district court decision in the Fourth Circuit that came out differently, *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798, 809-810 (E.D.N.C. 2014), was specifically disavowed by other courts in subsequent decisions, *Sierra Club*, 2017 WL 1095039, at *6 n.11; *Yadkin Riverkeeper*, 141 F. Supp. 3d at 445. As set out in the *Yadkin Riverkeeper* case, the court in *Cape Fear* mistakenly declined to exercise jurisdiction over hydrologically connected groundwater

30

"under the theory that the groundwater is not *itself* 'water of the United States.'"
*Yadkin Riverkeeper*, 141 F. Supp. 3d at 445 (internal quotation omitted).[8]

While it is true that the definition of "navigable waters" does not include groundwater, this point is irrelevant.  The issue is not the pollution of the groundwater itself, but the pollution of surface waters that have a direct hydrologic connection via groundwater to a point source.  The Clean Water Act unquestionably protects jurisdictional surface waters, and the overwhelming majority of courts that have weighed the appropriate question—whether the Clean Water Act covers the discharges of pollutants to surface waters from a point source through groundwater with a direct hydrological connection to the point source— have answered with a resounding yes.  Such discharges fall squarely within the scope of the Act.

This analysis explains the decisions of other Courts of Appeals.  For example, the Tenth Circuit has firmly upheld the jurisdiction of the Clean Water Act over surface water pollution conveyed by hydrologically connected groundwater.  *Quivira Mining Co. v. EPA*, 765 F.2d 126, 130 (10th Cir. 1985) ("the flow continues regularly through underground acquifers [sic] fed by the surface flow of the San Mateo Creek and Arroyo del Puerto [where uranium

---

[8] This same criticism applies to *Chevron U.S.A., Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807 (D. Md. 2015), a case analyzing Oil Pollution Act violations that the District Court followed.

mining waste was regularly discharged] into navigable-in-fact streams."); *see also Friends of Santa Fe Cty. v. LAC Minerals*, 892 F. Supp. 1333, 1357–59 (D.N.M. 1995) (stating that "the Tenth Circuit's expansive construction of the Clean Water Act's jurisdictional reach [in the *Quivira* case] ***foreclose[s] any argument that the [Clean Water Act] does not protect groundwater with some connection to surface waters,***" and explaining that "stormwater runoff from highways, construction sites or industrial parks" and from "abandoned surface and underground mines" constitutes nonpoint source pollution, while "discharges into groundwaters that eventually move into surface waters are prohibited" by the Clean Water Act) (emphasis added) (internal quotations omitted).[9]

Likewise, the Seventh Circuit has ruled that the Clean Water Act "authorizes EPA to regulate the disposal of pollutants into deep wells, at least ***when the regulation is undertaken in conjunction with limitations on the permittee's discharges into surface waters***." *U.S. Steel Corp. v. Train*, 556 F.2d 822, 852 (7th Cir. 1977) (emphasis added), *overruled on other grounds by City of W. Chicago v.*

---

[9] The District Court relied upon dicta in one footnote in a Tenth Circuit decision to support its conclusion that "migration of pollutants through soil and groundwater is nonpoint source pollution." App. 419-20 (District Ct. Op. at 10-11). However, that decision actually explains that when pollution "aris[es] from dispersed activities over large areas [and] is not traceable to a single, identifiable source or conveyance"—the exact opposite of this case where the pollution is the result of one large, historic gasoline spill near the waterway—then groundwater seepage is nonpoint source pollution. *Sierra Club v. El Paso Gold Mines, Inc*., 421 F.3d 1133, 1140 n.4 (10th Cir. 2005).

32

*U.S. Nuclear Regulatory Comm'n*, 701 F.2d 632, 644 (7th Cir. 1983).

These Tenth and Seventh Circuit decisions are directly relevant to the issue before the Court, unlike other decisions by the Seventh and Fifth Circuit that groundwater is not *per se* a water of the United States—a point that the Conservation Groups do not contest. *Rice v. Harken Expl. Co.*, 250 F.3d 264, 269 (5th Cir. 2001) (the "definition [of 'navigable waters'] is not so expansive as to include groundwater within the class of waters protected by the [Clean Water Act]"); *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir. 1994). The *Rice* and *Village of Oconomowoc Lake* decisions are irrelevant because they do not address the issue of discharges of pollutants to admittedly jurisdictional surface waters through directly-connected groundwater. In addition, in both cases the plaintiffs did not provide evidence that discharges moved through groundwater with a direct hydrological connection to surface waters. *Rice*, 250 F.3d at 272 (plaintiffs failed to provide "evidence of a close, direct and proximate link between [the defendant's] discharges of oil and any resulting actual, identifiable oil contamination of a particular body of natural surface water"); *Village of Oconomowoc Lake*, 24 F.3d at 965 (plaintiffs alluded only to the "possibility" of a hydrologic connection).

As the Department of Justice and EPA noted in an Amicus Curiae brief in a case on this issue that is currently before the Ninth Circuit Court of Appeals, these

Fifth and Seventh Circuit cases "do not foreclose application of the [Clean Water

Act] where a direct hydrological connection to jurisdictional surface waters can be

found."  Brief for the United States as Amicus Curiae Supporting Plaintiffs, *Haw.*

*Wildlife Fund v. Cty. of Maui*, No. 15-17447, at 19 (9th Cir.) (filed June 2, 2016).

The Amicus Curiae brief submitted to the Ninth Circuit outlines the position

of the EPA, through multiple administrations of both parties.  The EPA has

repeatedly affirmed that the Clean Water Act applies to hydrologically connected

groundwater discharges.  For example, the EPA stated that:

> [T]he Act requires NPDES permits for discharges to groundwater
> where there is a direct hydrological connection between groundwaters
> and surface waters.  In these situations, the affected groundwaters are
> not considered "waters of the United States" but discharges to them
> are regulated because such discharges are effectively discharges to the
> directly connected surface waters.

Amendments to the Water Quality Standards Regulation That Pertain to Standards

on Indian Reservations, 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991); *see also*

NPDES Permit Regulation and Effluent Limitations Guidelines and Standards for

Concentrated Animal Feeding Operations, 66 Fed. Reg. 2,960, 3,015-17 (Jan. 12,

2001) (EPA "interprets the Clean Water Act to apply to discharges of pollutants

from a point source via ground water that has a direct hydrologic connection to

surface water;" excluding such discharges "would . . . be inconsistent with the

overall Congressional goals expressed in the statute."); Reissuance of NPDES

General Permits for Storm Water Discharges from Construction Activities, 63 Fed.

34

Reg. 7,858, 7,881 (Feb. 17, 1998) ("EPA interprets the [Clean Water Act]'s

NPDES permitting program to regulate discharges to surface water via

groundwater where there is a direct and immediate hydrologic connection").

> Very recently, the EPA restated what it has said repeatedly over decades:

> [T]he agency has a longstanding and consistent interpretation that the Clean Water Act may cover discharges of pollutants from point sources to surface water that occur via ground water that has a direct hydrologic connection to the surface water. Nothing in [the regulation] changes or affects that longstanding interpretation, including the exclusion of groundwater from the definition of "waters of the United States."

EPA, *Response to Comments—Topic 10 Legal Analysis*, 386 (June 30, 2015),

https://19january2017snapshot.epa.gov/sites/production/files/2015-

06/documents/cwr_response_to_comments_10_legal.pdf.

Most recently, in a case presenting the same issue that is pending before the

Ninth Circuit, the EPA and the Department of Justice reiterated this longstanding

position and urged the Court of Appeals to uphold a District Court decision finding

that the Clean Water Act applied to discharges of sewage carried by groundwater

from injection sites to surface water.  Brief for the United States as Amicus Curiae

Supporting Plaintiffs, *Haw. Wildlife Fund v. Cty. of Maui*, No. 15-17447, at 19 (9th

Cir.) (filed June 2, 2016); *Haw. Wildlife Fund v. Cty. of Maui*, 24 F. Supp. 3d 980

(2014).

If this Court finds that there is statutory ambiguity as to whether the Clean

Water Act applies to discharges to surface water through groundwater, EPA's interpretation is entitled to deference. *See Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 844-45 (1984).

The EPA has further explained that the determination of whether groundwater is hydrologically connected to surface water is "a factual inquiry like all point source determinations." 66 Fed. Reg. at 3,017. A general, unspecific connection between groundwater and surface water is insufficient, *id.*; *see, e.g.*, *Greater Yellowstone Coal. v. Larsen*, 641 F. Supp. 2d 1120, 1139 (D. Idaho 2009) (connection too attenuated where movement to surface water could take up to 420 years and pollutants would have to travel underground up to four miles), but the type of pollutant, the geology, the direction of groundwater flow, and the fact that the pollutant can or does reach jurisdictional surface water can all help a court determine whether there is a qualifying connection, 66 Fed. Reg. at 3,017.

For this reason also, dismissal is inappropriate prior to discovery. Here, the Complaint sets out that a single large spill of gasoline from a specific point source traveled 1,000 feet or less in the direction that groundwater flows, that the pollution has flowed into the waterway through groundwater, and that the pollution was detected in the waterway the first time it was tested soon after the spill was discovered. The District Court was required to accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff.

Under all these authorities and the Clean Water Act itself, the Complaint should not have been dismissed.

## <u>CONCLUSION</u>

For these reasons, the Conservation Groups respectfully ask this Court to reverse the April 20, 2017 decision of the District Court dismissing the Conservation Groups' Complaint.

Respectfully submitted this the 12th day of July, 2017.

/s/ Frank S. Holleman III
fholleman@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
Facsimile: (919) 929-9421

/s/ Christopher K. DeScherer
cdescherer@selcsc.org
Southern Environmental Law Center
463 King Street, Suite B Charleston, SC 29403
Telephone: (843) 720-5270
Facsimile: (843) 720-5240

*Attorneys for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Conservation Groups respectfully request oral argument.  The resolution of this appeal will interpret the Clean Water Act and precedents to determine whether the continuing unpermitted discharge of pollutants into, even if not "directly" into, jurisdictional surface waters from a subsequently-repaired pipeline is a violation of the Act.  The resolution of this appeal also will determine whether an unpermitted discharge of pollutants from a point source to surface waters violates the Clean Water Act when the discharge is conveyed by groundwater with a direct hydrological connection to those surface waters.  These issues have not been specifically decided by the Fourth Circuit, and this Court's decision will have important repercussions for the ability of citizens to enforce the Clean Water Act. The opportunity to address these issues in greater detail to this Court, and to respond to inquiries from this Court, will aid the Court in its decision-making process.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 28.1(e)(2) and 32(a)(7)(b), the undersigned certifies that this brief has been prepared using fourteen point, proportionally spaced, serif typeface (Times New Roman). Excluding sections that do not count toward the word limit, the brief contains 9,454 words.

<u>/s/ Frank S. Holleman III</u>

*Attorney for Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system at the email addresses indicated below.

Clayton Monroe Custer – ccuster@wcsr.com
Richard Edwin Morton – rmorton@wcsr.com
James P. Cooney III – jcooney@wcsr.com


/s/ Frank S. Holleman III

*Attorney for Plaintiffs-Appellants*