IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| UPSTATE FOREVER and<br>SAVANNAH RIVERKEEPER, | ) | |
| | ) | |
| Plaintiffs – Appellants, | ) | Case No. 17-1640 |
| | ) | |
| v. | ) | |
| | ) | |
| KINDER MORGAN ENERGY | ) | |
| PARTNERS L.P. and | ) | |
| PLANTATION PIPE LINE | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendants – Appellees. | ) | |
| _____ | ) | |

**DEFENDANTS-APPELLEES' RESPONSE TO PLAINTIFFS-APPELLANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL MATERIAL**

COMES NOW, Kinder Morgan Energy Partners, L.P. and Plantation Pipe Line Company, Inc. ("Appellees"), by and through their undersigned attorneys, and respond and object to Plaintiffs – Appellants ("Appellants") Motion for Leave to File Supplemental Material.  In the alternative, and pursuant to Federal Rule of Appellate Procedure Rule 27(3)(B) and Local Rule 28(b), Appellees move this Court for leave to file supplemental materials as an attachment to their response brief. In support of this response and alternative motion, Appellees state the following:

1.     Appellants seek to do an end run around the Court's briefing limits by seeking leave to attach a 36-page amicus curiae brief filed by the United States on May 31, 2016 in support of the plaintiffs in the unrelated case of *Haw. Wildlife Fund v. Cty. of Maui*, No. 15-17447 (9th Cir.) ("9th Circuit Appeal").

2.     The facts and issues presented in the 9th Circuit Appeal differ from those before this Court. The 9th Circuit Appeal concerns a Hawaiian wastewater treatment facility's intentional and daily release of "three to five million gallons" of treated sewage effluent into four on-site injection wells (Appellants' Motion, Doc 16 at 18.) Conversely, this matter concerns Appellants' allegations of a single accidental release of petroleum from Appellees' pipeline which occurred more than two years ago and which was repaired and stopped within days of discovery. (Appellants Brief, Doc 14 at 15, 17.)

3.     This Court has long established rules for the submission of an amicus curiae brief, which have not been followed by either the United States or Appellants.  Federal Rule of Appellate Procedure Rule 29 sets forth these requirements and expressly permits the United States to file an amicus curiae brief in this matter without leave of this Court or consent of the parties. The United States has not done so.

4.     Appellants should not be permitted to side-step this Court's rules nor to represent to this Court the purported views of the United States as expressed by a prior administration.

5.     For these reasons, Appellees respectfully request that this Court deny Appellants' Motion for leave to file supplemental material.

6.     Alternatively, and pursuant to Federal Rule of Appellate Procedure Rule 27(3)(B) and Local Rule 28(b), if the Court is inclined to grant Appellants' Motion to file such supplemental material, then Appellees move this Court for leave to file the following supplemental materials as attachments to their response brief:

a)     Exec. Order No. 13778, Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the ''Waters of the United States'' Rule, February 28, 2017 (Exhibit A);

b)     Motion for Leave to File Amici Curiae Brief of the Association of California Water Agencies, California Association of Sanitation Agencies, California State Association of Counties, International Municipal Lawyers Association, League of California Cities, National Association of Clean Water Agencies, National Association of Counties, National League of Cities, National Water Resources Association in Support of

Defendant and Appellant County of Maui and in Support of

Reversal of the District Court's Decision  (Exhibit B);

c)      Motion of the Association of American Railroads; American

Farm Bureau Federation; American Iron and Steel Institute;

American Petroleum Institute; National Association of

Manufacturers; National Mining Association; The Fertilizer

Institute; and Utility Water Act Group for Leave to File Brief as

*Amicus Curiae* in Support of Defendant-Appellant (Exhibit C).

7.      Executive Order 13778 articulates the United States' current positions

on issues presented in the United States amicus brief in the 9th Circuit Appeal. To

the extent that this Court considers the United States' amicus brief and the

arguments made in that brief by the prior executive branch administration,

Appellees respectfully request that the Court also consider the current

administration's views as stated by the President of the United States on February

28, 2017 in Executive Order 13778.

8.      The additional amici curiae briefs attached as Exhibits B and C

articulate the arguments of 17 amici curiae on the issues presented in the 9th Circuit

Appeal. To the extent that this Court considers the United States' amicus brief and

the arguments made therein, Appellees respectfully request that the Court also consider the arguments made by each additional amicus curiae in that appeal.[1]

9. In accordance with Local Rule 27(a), counsel for Appellees conferred with counsel for Appellants for their position on this motion in the alternative. Counsel for Appellants do not object to Appellees motion to for leave to file Exhibit A, Exec. Order No. 13778, Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the ''Waters of the United States'' Rule, February 28, 2017. Counsel for Appellants oppose and intend to file a response in opposition to Appellees motion for leave to file Exhibits B and C.

Wherefore, Appellees respectfully request that the Court deny the Appellants' motion for leave to file supplemental material or, in the alternative grant Appellees leave to file the Executive Order 13778 and all additional amici curiae briefs in the 9th Circuit Appeal as attachments to their response brief.

Respectfully submitted this the 24th day of July, 2017.

> s/ Richard E. Morton
> Richard E. Morton
> D.S.C. Bar No. 5442
> James P. Cooney, III
> Clayton M. Custer
> Womble Carlyle Sandridge & Rice, LLP
> 3500 One Wells Fargo Center
> 301 South College Street

---

[1] Appellants note that Plaintiffs-Appellees in the 9th Circuit Appeal have filed oppositions to Exhibits B and C, and the 9th Circuit Court of Appeals has not yet granted leave to file Exhibits B or C.

Charlotte, NC 28202
Tel: 704-331-493
Fax: 704-444-9963
rmorton@wcsr.com
jcooney@wcsr.com
ccuster@wcsr.com

*Attorneys for Defendants/Appellees Kinder
Morgan Energy Partners, L.P. and
Plantation Pipe Line Company, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July, 2017, the foregoing **DEFENDANTS-APPELLEES' RESPONSE TO PLAINTIFFS-APPELLANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL MATERIAL AS AN EXHIBIT TO THE BRIEF** was served on all parties or their counsel of record through the CM/ECF system at the email addresses indicated below:

Frank S. Holleman, III at fholleman@selcnc.org
Christopher K. DeScherer at cdescherer@selcsc.org

s/ Richard E. Morton
Richard E. Morton
D.S.C. Bar No. 5442
Womble Carlyle Sandridge & Rice, LLP
3500 One Wells Fargo Center
301 South College Street
Charlotte, NC 28202
Tel: 704-331-493
Fax: 704-444-9963
rmorton@wcsr.com

*Attorneys for Defendants/Appellees Kinder Morgan Energy Partners, L.P. and Plantation Pipe Line Company, Inc.*

WCSR 40355291v1

## <u>Exhibit A</u>

Exec. Order No. 13778, Restoring the Rule of Law, Federalism, and Economic
Growth by Reviewing the ''Waters of the United States'' Rule, February 28, 2017

**Federal Register**

Vol. 82, No. 41

Friday, March 3, 2017

# Presidential Documents

---

Title 3—

The President

Executive Order 13778 of February 28, 2017

## Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy*. It is in the national interest to ensure that the Nation's navigable waters are kept free from pollution, while at the same time promoting economic growth, minimizing regulatory uncertainty, and showing due regard for the roles of the Congress and the States under the Constitution.

**Sec. 2**. *Review of the Waters of the United States Rule.* (a) The Administrator of the Environmental Protection Agency (Administrator) and the Assistant Secretary of the Army for Civil Works (Assistant Secretary) shall review the final rule entitled "Clean Water Rule: Definition of 'Waters of the United States,'" 80 *Fed. Reg.* 37054 (June 29, 2015), for consistency with the policy set forth in section 1 of this order and publish for notice and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with law.

(b) The Administrator, the Assistant Secretary, and the heads of all executive departments and agencies shall review all orders, rules, regulations, guidelines, or policies implementing or enforcing the final rule listed in subsection (a) of this section for consistency with the policy set forth in section 1 of this order and shall rescind or revise, or publish for notice and comment proposed rules rescinding or revising, those issuances, as appropriate and consistent with law and with any changes made as a result of a rulemaking proceeding undertaken pursuant to subsection (a) of this section.

(c) With respect to any litigation before the Federal courts related to the final rule listed in subsection (a) of this section, the Administrator and the Assistant Secretary shall promptly notify the Attorney General of the pending review under subsection (b) of this section so that the Attorney General may, as he deems appropriate, inform any court of such review and take such measures as he deems appropriate concerning any such litigation pending the completion of further administrative proceedings related to the rule.

**Sec. 3**. *Definition of "Navigable Waters" in Future Rulemaking.* In connection with the proposed rule described in section 2(a) of this order, the Administrator and the Assistant Secretary shall consider interpreting the term "navigable waters," as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos* v. *United States,* 547 U.S. 715 (2006).

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 28, 2017.*

[FR Doc. 2017–04353
Filed 3–2–17; 11:15 am]
Billing code 3295–F7–P

## **Exhibit B**

Motion for Leave to File Amici Curiae Brief of the Association of California Water Agencies, California Association of Sanitation Agencies, California State Association of Counties, International Municipal Lawyers Association, League of California Cities, National Association of Clean Water Agencies, National Association of Counties, National League of Cities, National Water Resources Association in Support of Defendant and Appellant County of Maui and in Support of Reversal of the District Court's Decision

*Appeal No. 15-17447*

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

COUNTY OF MAUI,

*Appellant,*

vs.

HAWAII WILDLIFE FUND; SIERRA CLUB - MAUI GROUP; SURFRIDER FOUNDATION; WEST MAUI PRESERVATION ASSOCIATION,

*Appellees.*

---

On Appeal From the United States District Court for the District of Hawai'i
Honorable Susan Oki Mollway, Chief Judge
Case No. 12-00198 SOM/BMK

---

**MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF OF THE ASSOCIATION OF CALIFORNIA WATER AGENCIES, CALIFORNIA ASSOCIATION OF SANITATION AGENCIES, CALIFORNIA STATE ASSOCIATION OF COUNTIES, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, LEAGUE OF CALIFORNIA CITIES, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, NATIONAL WATER RESOURCES ASSOCIATION IN SUPPORT OF DEFENDANT AND APPELLANT COUNTY OF MAUI AND IN SUPPORT OF REVERSAL OF THE DISTRICT COURT'S DECISION**

SHAWN HAGERTY, Bar No. 182435
ANDRE MONETTE, Bar No. 248245
REBECCA ANDREWS, Bar No. 272967
BEST BEST & KRIEGER LLP
655 West Broadway, 15th Floor
San Diego, California 92101
Tel: (619) 525-1300/Fax: (619) 233-6118
Attorneys for *Amici Curiae*

**[ADDITIONAL COUNSEL ON FOLLOWING PAGE]**

RODERICK E. WALSTON, Bar No. 32675
BEST BEST & KRIEGER LLP
2001 N. Main Street, Suite 390
Walnut Creek, CA 94596
Telephone: (925) 977-3300
Facsimile:  (925) 977-1870
Attorneys for *Amici Curiae*

## MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF

This motion for leave to file an *amici curiae* brief by the Association of California Water Agencies, the California Association of Sanitation Agencies, the California State Association of Counties, the International Municipal Lawyers Association, the League of California Cities, the National Association of Clean Water Agencies, the National Association of Counties, the National League of Cities, and the National Water Resources Association is made pursuant to Federal Rules of Appellate Procedure ("FRAP") 29(b). The grounds for the motion and the interest of the *amici* are set forth in the attached memorandum of points and authorities. The *amici* brief is also attached to this motion.

The *amici* have attempted to obtain the consent of all parties to the filing of this brief, as required by Circuit Rule 29-3. As of the date of this motion, defendant and appellant, County of Maui, has consented to the filing of the proposed *amici* brief. Counsel for Plaintiffs Earthjustice Legal Defense Fund, has not granted consent to the filing of the proposed brief.

## CERTIFICATE OF INTEREST

(1) The *amici* are the Association of California Water Agencies, the California Association of Sanitation Agencies, the California State Association of Counties, the International Municipal Lawyers Association, the League of

California Cities, the National Association of Clean Water Agencies, the

National Association of Counties, the National League of Cities, and the

National Water Resources Association.

(2)    No party's counsel authored the proposed *amici* brief in whole or in

part.  No party or party's counsel contributed money intended to fund preparing

or submitting the proposed brief.  No person, other than *amici curiae*, its

members, or its counsel, contributed money that was intended to fund preparing

or submitting the proposed brief.

(3)    The Corporate Disclosure Statement is provided below.

## CORPORATE DISCLOSURE STATEMENT

*Amici* represent that no parent corporation(s) or publicly held

corporation(s) own 10% or more of the stock in any *amici*.  FRAP 26.1

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO FILE *AMICI CURIAE* BRIEF

Under Federal Rules of Appellate Procedure ("FRAP") 29(b), a motion for leave to file an *amicus* brief must state the movant's interest, and the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case. As explained below, the *amici*'s brief meets these requirements.

## I.    IDENTITY AND INTEREST OF *AMICI CURIAE* (FRAP 29(c)(4))

*Amici* are organizations from across the United States whose members are primarily governmental entities, including counties, cities, special districts and public utilities that provide water, wastewater and stormwater management services to their citizens.

### A.    Identity of *Amici Curiae*

The Association of California Water Agencies ("ACWA") is the largest coalition of public water agencies in the nation, representing 440 public water agencies, which provide water supplies for urban and agricultural use. ACWA's member agencies range in size from small irrigation districts to the largest water wholesalers in the country.

The California Association of Sanitation Agencies ("CASA") is a non-profit mutual benefit corporation organized and existing under the laws of the State of California. CASA is comprised of more than 100 local public agencies,

61214.00000\24497873.4

3

including cities, sanitation districts, sanitary districts, community services districts, sewer districts, county water districts, California water districts, and municipal utility districts. CASA's member agencies provide wastewater collection, treatment, water recycling, renewable energy and biosolids management services to millions of California residents, businesses, industries, and institutions.

The California State Association of Counties ("CSAC") is a non-profit corporation whose membership consists of the 58 California counties. CSAC sponsors a Litigation Coordination Program, which is administered by the County Counsels' Association of California and is overseen by the Association's Litigation Overview Committee, comprised of county counsels throughout the state. The Litigation Overview Committee monitors litigation of concern to counties statewide and has determined that this case is a matter affecting all counties.

The International Municipal Lawyers Association ("IMLA") is a non-profit, nonpartisan professional organization comprised of local government entities, including cities, counties, and subdivisions thereof, as represented by their chief legal officers, state leagues, and individual attorneys. Established in 1935 and consisting of more than 2,500 members, IMLA is the oldest and largest association of attorneys representing United States municipalities,

counties, and special districts. IMLA's mission is to advance responsible development of municipal law through education and advocacy by providing the collective viewpoint of local governments around the country.

The League of California Cities ("League") is an association of 474 California cities dedicated to protecting and restoring local control to provide for the public health, safety, and welfare of their residents, and to enhance the quality of life for all Californians. The League is advised by its Legal Advocacy Committee, comprised of 24 city attorneys from all regions of the State. The Committee monitors litigation of concern to municipalities, and identifies those cases that have statewide or nationwide significance. The Committee has identified this case as having such significance.

The National Association of Clean Water Agencies ("NACWA") is a non-profit trade association representing the interests of publicly owned wastewater and stormwater utilities across the United States. NACWA's members include nearly 300 municipal clean water agencies that own, operate, and manage publicly owned treatment works, wastewater sewer systems, stormwater sewer systems, water reclamation districts, and all aspects of wastewater collection, treatment, and discharge.

The National Association of Counties ("NACo") is the only national association that represents county governments in the United States. NACo

serves as an advocate for county government and works to ensure that counties have the resources, skills and support needed to successfully lead their communities. NACo's members provide water, wastewater and flood control services to residents of the nation's 3,069 counties.

The National League of Cities ("NLC") is the country's largest and oldest organization serving municipal governments and represents more than 19,000 United States cities and towns. Many of NLC's members provide water and wastewater services. NLC advocates on behalf of cities on critical issues that affect municipalities and warrant action.

The National Water Resources Association ("NWRA") is a non-profit, voluntary organization of state water associations, whose members include cities, towns, water conservation and conservancy districts, irrigation and reservoir companies, ditch companies, farmers, ranchers, and others with an interest in water issues in the western states. NWRA has member associations in Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Texas, Utah, and Washington.

**B.    Interest of _Amici Curiae_**

_Amici_ and their members have a significant interest in the issues presented in this case. _Amici_'s members are largely public agencies and public utilities that provide important water supply, water conservation, water treatment and

stormwater management services. They are responsible for managing water resources in a complex web of overlapping laws and ever-changing environmental and societal demands. *Amici*'s members use recycled water to augment groundwater and drinking water supplies, and to irrigate recreational and agricultural lands. Members collect and treat wastewater, which may then be stored in percolation ponds and spreading grounds where it can add to groundwater supplies. They own and operate surface water impoundments, subsurface water distribution systems, and wastewater collection lines. They employ low impact development ("LID") and other "green infrastructure" strategies to retain, infiltrate, and percolate storm water flows into groundwater, prevent sewage spills, and otherwise capture and reuse stormwater through means such as aquifer storage and recovery.

In providing the services described above, *Amici*'s members discharge to groundwater in some way. The issues presented in this case will define the circumstances under which a Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permit is required for the continued operation and innovative development of *amici*'s members' programs.

*Amici* bring a broad, national perspective on the use of innovative programs, including groundwater management, to help supply water throughout the country and improve water quality. *Amici* view water as a single supply in

different phases. *Amici*'s members have designed their projects and operations to maximize water treatment, quality, storage and production under the current regulatory scheme. If the Court of Appeals upholds or in any way endorses the district court's decision below, *amici's* members may be required to comply with a new paradigm for groundwater and water quality regulation. This new paradigm will result in overlapping regulatory structures, create infeasible obligations and undermine the ability of *amici*'s members to implement current and innovative programs to meet the needs of their residents while protecting water quality. Thus, *amici* have a significant interest in the issues presented in this case.

## II.  THE *AMICI* BRIEF IS DESIRABLE, BECAUSE IT ADDRESSES ISSUES RELEVANT TO THE DISPOSITION OF THE CASE AND WILL CONTRIBUTE TO THE COURT'S UNDERSTANDING OF THE COMPLEX ISSUES RAISED IN THIS LITIGATION.

The *amici* brief is desirable, because it addresses relevant issues in this litigation and will contribute to the court's understanding of the complex issues raised in this litigation.

*Amici* urge this Court to reject the district court's legally unsupportable holding that discharges to groundwater require an NPDES permit. The Clean Water Act requires an NPDES permit for the (1) "discharge of any pollutant" (2) to "navigable waters" (3) from a "point source." 33 U.S.C. §§ 1311(a), 1342, 1362; 40 C.F.R. § 122.2. The district court eliminates the "point source"

61214.00000\24497873.4

requirement by concluding that "liability under the Clean Water Act is triggered

when pollutants reach navigable water, regardless of *how* they get there."

Hawai'i Wildlife Fund v. County of Maui, 24 F.Supp.3d 980, 1000 (D. Haw.

May 30, 2014) ("Maui I") (emphasis in original).

     The district court recognizes its conclusion is legally unsupportable,

stating that "it cannot point to controlling appellate law or statutory text

expressly allowing this theory in the present context." Id., p. 996. Indeed, the

applicable statutory text requires the opposite conclusion: a "point source" is

defined by the Clean Water Act as "any discernible, confined and concrete

conveyance," 33 U.S.C. §§ 1362(14). Despite the directive of the NPDES

program, the district court finds that liability arises when pollutants reach

navigable waters, and that discharges from point sources "need not also be

'confined and discrete.'" Maui I, 24 F.Supp.3d at 999. In effect, the district

court transmutes the "significant nexus" test for "waters of the United States"

into the point source context in order to rewrite the point source definition. Id.,

pp. 997-1000.

     Elimination of the requirement that a "point source" be "confined and

discrete" imposes liability under the NPDES program for discharges to

groundwater, even though groundwater is not a "navigable water" or a "point

source." Id., p. 996 [groundwater is not "necessarily *itself* part of the navigable

waters of the United States."]; <u>Hawai'i Wildlife Fund v. County of Maui</u>, No.
13-00198, 2015 U.S. Dist. LEXIS 8189, *18 (Jan. 23, 2015) [the "court did not
rely on the proposition that the groundwater in this case served as a point
source"].

Such expansion of the Clean Water Act has serious policy implications
for members of *amici*.  It overburdens regulatory agencies and members of
*amici* by duplicating existing, extensive state and federal groundwater laws and
regulations.  It creates uncertainty as to how, both in scope and manner, the
NPDES program's requirements are to be applied to groundwater.  Perhaps
most significantly, if affirmed by the Ninth Circuit, the district court's decision
threatens *amici* members' projects that provide clean, reliable drinking water to
millions of people across the nation and protect the nation's "navigable waters"
by exposing thousands of lawfully operating water supply and water
conservation projects to citizen suit liability in the midst of serious scientific and
regulatory uncertainty.

*Amici* believe the brief will significantly contribute to the Court's
understanding of the issues raised in this proceeding.  The *amici* have
substantial knowledge, experience and expertise concerning water and
wastewater management and development throughout the country, including the
statutory systems regulating groundwater.  The *amici*'s brief addresses issues

10

relevant to the disposition of this litigation, and *amici* are directly affected by the issues raised in this case.  For these reasons, the filing of the *amici*'s brief is desirable and relevant to the issues.

## **CONCLUSION**

For the foregoing reasons, the *amici* have an interest in the issues presented in this case; the *amici* brief addresses relevant issues in this litigation; and the filing of the *amici*'s brief is desirable.  Therefore, the motion for leave to file the *amici* brief should be granted.

Dated:      March 28, 2016               Respectfully submitted,

By: */s/ Shawn Hagerty*
      RODERICK E. WALSTON
      SHAWN HAGERTY
      ANDRE MONETTE
      REBECCA ANDREWS
      Attorneys for *Amici Curiae*
      Association of California Water
      Agencies, California Association of
      Sanitation Agencies, California
      State Association of Counties,
      International Municipal Lawyers
      Association, League of California
      Cities, National Association of
      Clean Water Agencies, National
      Association of Counties, National
      League of Cities, National Water
      Resources Association

61214.00000\24497873.4

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed:

**MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF OF THE ASSOCIATION OF CALIFORNIA WATER AGENCIES, CALIFORNIA ASSOCIATION OF SANITATION AGENCIES, CALIFORNIA STATE ASSOCIATION OF COUNTIES, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, LEAGUE OF CALIFORNIA CITIES, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, NATIONAL WATER RESOURCES ASSOCIATION IN SUPPORT OF DEFENDANT AND APPELLANT COUNTY OF MAUI AND IN SUPPORT OF REVERSAL OF THE DISTRICT COURT'S DECISION** with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/ECF System on March 28, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

**Plaintiffs/Appellees**

David Henkin, Esq.
Summer Kupau-Odo, Esq.
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, HI 93813

**County of Maui**

Patrick K. Wong
Richelle M. Thomson
200 South Hight Street
Wailuku, Maui, Hawai'i 76793
Phone:  (808) 270-7740

**Hunton & Williams LLP**

Michael R. Shebelskie
951 East Byrd Street
Richmond, Virginia 23219
Phone (904) 788-8716

Colleen P. Doyle
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Phone:  (213) 532-2000

Executed on March 28, 2016 at Walnut Creek, California.

*/S/ Irene Islas*
Irene Islas

*Appeal No. 15-17447*

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

COUNTY OF MAUI,

*Appellant,*

vs.

HAWAII WILDLIFE FUND; SIERRA CLUB - MAUI GROUP; SURFRIDER FOUNDATION; WEST MAUI PRESERVATION ASSOCIATION,

*Appellees.*

---

On Appeal From the United States District Court for the District of Hawai'i
Honorable Susan Oki Mollway, Chief Judge
Case No. 12-00198 SOM/BMK

---

**MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF OF THE ASSOCIATION OF CALIFORNIA WATER AGENCIES, CALIFORNIA ASSOCIATION OF SANITATION AGENCIES, CALIFORNIA STATE ASSOCIATION OF COUNTIES, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, LEAGUE OF CALIFORNIA CITIES, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, NATIONAL WATER RESOURCES ASSOCIATION IN SUPPORT OF DEFENDANT AND APPELLANT COUNTY OF MAUI AND IN SUPPORT OF REVERSAL OF THE DISTRICT COURT'S DECISION**

SHAWN HAGERTY, Bar No. 182435
ANDRE MONETTE, Bar No. 248245
REBECCA ANDREWS, Bar No. 272967
BEST BEST & KRIEGER LLP
655 West Broadway, 15th Floor
San Diego, California 92101
Tel: (619) 525-1300/Fax: (619) 233-6118
Attorneys for *Amici Curiae*

**[ADDITIONAL COUNSEL ON FOLLOWING PAGE]**

61214.00000\24613262.1

RODERICK E. WALSTON, Bar No. 32675
Best Best & Krieger LLP
2001 N. Main Street, Suite 390
Walnut Creek, CA 94596
Telephone:   (925) 977-3300
Facsimile:    (925) 977-1870
Attorneys for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................1

STATEMENT OF COMPLIANCE WITH RULE 29(C)(5)............................1

CONSENT OF THE PARTIES ...........................................................................1

INTEREST OF THE AMICI CURIAE ...............................................................1

ARGUMENT .......................................................................................................4

I.  THE DISTRICT COURT'S DECISION HAS NO BASIS IN THE
    TEXT OF THE CLEAN WATER ACT, ITS LEGISLATIVE
    HISTORY, REGULATIONS OR CONTROLLING CASE LAW ..........4

    A.  The District Court's Analysis Ignores the Point Source
        Requirement of the NPDES Program ...............................................5

    B.  The Conduit Theory Confuses Point Source Analysis with the
        Significant Nexus Test and Waters of the United States
        Jurisprudence ...............................................................................11

    C.  The Groundwater at Issue is Neither a Water of the United
        States nor a Point Source ...............................................................13

II. EXPANDING THE NPDES PROGRAM TO THE MIGRATION
    OF POLLUTANTS THROUGH GROUNDWATER REWRITES
    THE EXISTING REGULATORY SCHEME, RESULTS IN AN
    INFEASIBLE PROGRAM AND UNDERMINES INNOVATIVE
    APPROACHES TO WATER MANAGEMENT ...................................15

    A.  Expansion of the Act Overburdens Existing Groundwater
        Regulatory Structures ...................................................................15

        1.  The District Court's Decision Interferes with Existing
            Federal Groundwater Regulations .....................................16

        2.  The District Court's Decision Interferes with State Law
            and State Authority Over Water Resources ........................17

    B.  Implementation of the NPDES Program in the Groundwater
        Context Would be Infeasible ........................................................19

        1.  Diffuse Points of Discharge are Difficult or Impossible
            to Locate ..........................................................................20

## TABLE OF CONTENTS
### (continued)

Page

2.    Physical Differences between Surface and Groundwater Make Permit Requirements Impossible to Formulate and Implement ................................................. 21

C.    The District Court's Decision Improperly Exposes Amici's Members to Liability for Lawful Operations Critical to Public Health and Safety ................................................. 24

1.    Groundwater Recharge ........................................ 24

2.    Other Recycled Water ........................................ 25

3.    Other Water Supply Infrastructure ..................... 26

4.    Low Impact Development and Green Infrastructure .......... 27

5.    Regulatory Enforcement and Third Party Lawsuits ........... 28

CONCLUSION ................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ariz. State Bd. for Charter Schools v. U.S. Dep't of Educ.
    464 F.3d 1003 (9th Cir. 2006) ....................................................19

California Oregon Power Co. v. Beaver Portland Cement Co.
    295 U.S. 142 (1935) ..................................................................18

California v. United States
    438 U.S. 645 (1978) ..................................................................18

Caminetti v. United States (1917)
    242 U.S. 470...............................................................................7

Coldani v. Hamm
    No. 07-660, 2007 WL 2345016 ..................................................14

Ecological Rights Found. v. Pac. Gas & Elec. Co.
    713 F.3d 502 (9th Cir. 2013) .......................................................8

Exxon Corp. v. Train
    554 F.2d 1310 (5th Cir. 1977) ...................................................14

Great Basin Mine Watch v. Hankins
    456 F.3d 955(9th Cir. 2006) ......................................................19

Greater Yellowstone Coalition v. Lewis
    628 F.3d 1143 (9th Cir. 2010) ..........................................8, 9, 20

Hawai'i Wildlife Fund v. County of Maui
    24 F.Supp.3d 980 (D. Haw. May 30, 2014) ..........................*passim*

Hawai'i Wildlife Fund v. County of Maui
    No. 12-00198, 2015 U.S. Dist. LEXIS 82395 (D. Haw. June 25,
    2015) ...........................................................................4, 14, 15

Headwaters, Inc. v. Talent Irrigation Dist.
    243 F.3d 526 (9th Cir. 2001) .......................................................5

Idaho Rural Council v. Bosma
    143 F.Supp.2d 1169 (D. Idaho 2001)............................................................14

Kasten v. Saint-Gobain Performance Plastics Corp.
    131 S. Ct. 1325 (2011).................................................................................21

Lingle v. Chevron U.S.A.
    544 U.S. 528 (2005) ............................................................................ 11, 12

N. Cal. River Watch v. City of Healdsburg
    496 F.3d 993 (9th Cir. 2007) ............................................................... 11, 13

Or. Natural Desert Ass'n v. U.S. Forest Svc.
    550 F.3d 778 (9th Cir. 2008) ................................................................... 5, 6

Oregon Natural Desert Ass'n v. Dombeck
    172 F.3d 1092 (9th Cir. 1998) ................................................................ 8, 13

Oregon Natural Resources Council v. U.S. Forest Service
    834 F.2d 842 (9th Cir. 1987) ........................................................................6

Pac. Coast Fedn. of Fishermen's Ass'ns v. Glaser
    2013 U.S. Dist. LEXIS 132240 (E.D. Cal. Sept. 16, 2013) .........................22

Rapanos v. United States
    547 U.S. 71 (2006) .....................................................................................11

Rapanos v. United States
    547 U.S. 715 (2006) (Kennedy, J., concurring) .........................................12

Rice v. Harken Exploration Co.
    250 F.3d 264 (5th Cir. 2001) .....................................................................14

S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians
    541 U.S. 95 (2004) .....................................................................................18

Sierra Club v. Abston Constr. Co.
    620 F.2d 41 (5th Cir. 1980) ..................................................................... 8, 9

Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of
    Engineers
    531 U.S. 159 (2001) ...................................................................................11

The Daniel Ball,
    77 U.S. 557, 563 (1870)...............................................................18

Trustees for Alaska v. EPA
    749 F.2d 549 (9th Cir. 1984) ......................................................9

Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc. ........ 13, 14

United States v. Appalachian Elec. Power Co.
    311 U.S. 377 (1940) ................................................................18

United States v. Earth Sciences, Inc.
    599 F.2d 368 (10th Cir. 1979) ...................................................11

United States v. Plaza Health Lab.
    3 F.3d 643 (2d Cir. 1993) ......................................................8, 21

Vill. Of Oconomowoc Lake v. Dayton Hudson Corp.
    24 F.3d 962 (7th Cir. 1994) .......................................................14

Virginia v. Browner
    80 F.3d 869 (4th Cir. 1996) .......................................................18

W.R. Grace & Co. v. United States EPA
    261 F.3d 330 (3d Cir. 2001) .......................................................27

Wash. Wilderness Coal. v. Hecla Min. Co.
    870 F.Supp. 983 (E.D. Wash. 1994) ......................................11, 14

Williams Pipe Line Co. v. Bayer Corp.
    964 F.Supp. 1300 (S.D. Iowa 1997).....................................11, 14

**Federal Statutes**

7 U.S.C. 136 ...............................................................................16

33 U.S.C. §§ 1251(b), (g) ............................................................18

33 U.S.C. § 1288(b)(2)(K)............................................................10

33 U.S.C. § 1311(a)................................................................5, 10, 15

33 U.S.C. § 1311(e)......................................................................22

33 U.S.C. § 1342 .........................................................................15

33 U.S.C. § 1342(a) ........................................................ 5, 6, 10

33 U.S.C. § 1342(b)(1)(D) ............................................... 10

33 U.S.C. 1342(p)(3)(B) .................................................. 28

33 U.S.C. § 1342(12) ...................................................... 10

33 U.S.C. 1362(14) ........................................................ 5, 14

33 U.S.C. § 1365 ............................................................ 29

42 U.S.C. § 300f, .......................................................... 15, 16

42 U.S.C. 6901 .............................................................. 16

42 U.S.C. 9601 .............................................................. 16

**State Statutes**

Haw. Rev. Stat. § 340E-2 .............................................. 18

Mo. Rev. Stat. § 644.061.1 ........................................... 16

Or. Rev. Stat. § 468B.150 ............................................. 16

**Federal Regulations**

40 C.F.R. ...................................................................... 22

40 C.F.R. 122.26 ........................................................... 28

40 C.F.R. 122.44(a) ....................................................... 22

40 C.F.R. 144.1 . ........................................................... 15, 16

40 C.F.R. § 122.2 .......................................................... *passim*

40 C.F.R. § 122.21(j)(4)(i) ............................................. 23

40 C.F.R. § 122.41-122.50 ............................................. 17

40 C.F.R. § 122.41(l) ..................................................... 23

40 C.F.R.§ 122.44 ......................................................... 22

40 C.F.R. § 144.12 ...................................................................17

40 C.F.R. §§ 146.1-146.14 .....................................................17

40 C.F.R. § 144.25 ..................................................................17

**Federal Registers**

80 Fed. Reg. 63552 (2015) ......................................................22

**Legislative History**

117 Cong. Rec. 38,722 (Nov. 2, 1971) ....................................7

131 Cong. Rec. 15,616 (June 13, 1985) ..................................20

S. Rep. 95-370, at 10 ...............................................................7

S. Rep. No. 92-414, at 39 (1972) .............................................7

## CORPORATE DISCLOSURE STATEMENT

*Amici* represent that no parent corporation(s) or publicly held corporation(s) own 10% or more of the stock in any *amici*.

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

No party's counsel authored the proposed *amici* brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the proposed brief. No person, other than *amici curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting the proposed brief.

## CONSENT OF THE PARTIES

Defendant and appellant, County of Maui, has consented to the filing of the proposed *amici* brief. Counsel for Plaintiffs Earthjustice Legal Defense Fund, has not granted consent to the filing of the proposed brief.

## INTEREST OF THE *AMICI CURIAE*

The Association of California Water Agencies ("ACWA") is the largest coalition of public water agencies in the nation, representing 440 public water agencies, which provide water supplies for urban and agricultural use.

The California Association of Sanitation Agencies ("CASA") is a non-profit mutual benefit corporation comprised of more than 100 local public agencies, including cities, sanitation districts, sanitary districts, community services districts, sewer districts, county water districts, California water

districts, and municipal utility districts. CASA's member agencies provide wastewater collection, treatment, water recycling, renewable energy and biosolids management services to millions of California residents, businesses, industries, and institutions.

The California State Association of Counties ("CSAC") is a non-profit corporation whose membership consists of the 58 California counties. CSAC's Litigation Overview Committee monitors litigation of concern to counties statewide and has determined that this case is a matter affecting all counties.

The International Municipal Lawyers Association ("IMLA") is a non-profit, nonpartisan professional organization comprised of local government entities, including cities, counties, and subdivisions thereof, as represented by their chief legal officers, state leagues, and individual attorneys. Established in 1935 and consisting of more than 2,500 members, IMLA is the oldest and largest association of attorneys representing United States municipalities, counties, and special districts.

The League of California Cities ("League") is an association of 474 California cities dedicated to protecting and restoring local control to provide for the public health, safety, and welfare of their residents, and to enhance the quality of life for all Californians. The League's Legal Advocacy Committee has identified this case as having statewide or national significance.

The National Association of Clean Water Agencies ("NACWA") is a non-profit trade association representing the interests of publicly owned wastewater and stormwater utilities across the United States.  NACWA's members include nearly 300 municipal clean water agencies that own, operate, and manage publicly owned treatment works, wastewater sewer systems, stormwater sewer systems, water reclamation districts, and all aspects of wastewater collection, treatment, and discharge.

The National Association of Counties ("NACo") is the only national association that represents county governments in the United States.  NACo's members provide water, wastewater and flood control services to residents of the nation's 3,069 counties.

The National League of Cities ("NLC") is the country's largest and oldest organization serving municipal governments and represents more than 19,000 United States cities and towns.  Many of NLC's members provide water and wastewater services.

The National Water Resources Association ("NWRA") is a non-profit, voluntary organization of state water associations, whose members include cities, towns, water conservation and conservancy districts, irrigation and reservoir companies, ditch companies, farmers, ranchers, and others with an interest in water issues in the western states.

*Amici*'s members are responsible for important water supply, water conservation, water treatment and stormwater management services that all discharge to groundwater in some way. The issues presented in this case will define the circumstances under which a Clean Water Act National Pollutant Discharge Elimination System ("NPDES") permit is required for the continued operation and innovative development of *amici*'s members' services to its public constituents.

## ARGUMENT

### I. THE DISTRICT COURT'S DECISION HAS NO BASIS IN THE TEXT OF THE CLEAN WATER ACT, ITS LEGISLATIVE HISTORY, REGULATIONS OR CONTROLLING CASE LAW

The district court issued a series of summary judgment rulings that collectively apply the Clean Water Act's NPDES permit program to the migration of pollutants from four underground injection control wells at the Lahaina Waste Reclamation Facility through groundwater to the Pacific Ocean.[1] The district court reached this conclusion by applying a novel "conduit" theory that requires an NPDES permit whenever pollutants leave an original point

---

[1] Relevant here are the first two decisions, where the district court determined that discharges from well numbers 3 and 4 require an NPDES permit, Hawai'i Wildlife Fund v. County of Maui, 24 F.Supp.3d 980 (D. Haw. May 30, 2014) ("Maui I"); and relied on the same reasoning to require an NPDES permit for discharges from well numbers 1 and 2, Hawai'i Wildlife Fund v. County of Maui, No. 12-00198, 2015 U.S. Dist. LEXIS 82395 *18 (D. Haw. June 25, 2015) ("Maui II")

4

source and ultimately reach navigable waters "regardless of *how* they get there .

. . ." Maui I, 24 F.Supp.3d at 1000 (emphasis in original). *How* pollutants get

to navigable waters, however, is the threshold trigger for the NPDES program.

Or. Natural Desert Ass'n v. U.S. Forest Svc., 550 F.3d 778, 780 (9th Cir. 2008).

Despite acknowledging the lack of controlling appellate or statutory

authority to support its approach, the district court disregarded the NPDES

program's threshold "point source" requirement and erroneously imposed

liability based on the migration of pollutants through a diffuse, non-point

source. If upheld by this Court, the decision will effectively rewrite the NPDES

program by eliminating the distinction between point source discharges, which

require an NPDES permit, and non-point source discharges, which do not

require an NPDES permit.

**A.    The District Court's Analysis Ignores the Point Source
         Requirement of the NPDES Program**

The NPDES program is triggered by the "discharge of a pollutant" or

"pollutants," which the Clean Water Act defines jointly as "any addition of any

pollutant to navigable waters from any point source . . . ." See 33 U.S.C.

§§ 1311(a), 1342(a); 1362(12); 40 C.F.R. § 122.2; see also Headwaters, Inc. v.

Talent Irrigation Dist., 243 F.3d 526, 532 (9th Cir. 2001). A "point source" is

"any discernible, confined, and discrete conveyance," which may include a

discernible, confined and discrete "conduit[.]" 33 U.S.C. § 1362(14); 40 C.F.R.

§ 122.2.   The district court's holding, however, is based on the erroneous theory that for the NPDES program to apply, a point source need not actually deposit the pollutant into the navigable water, because a "conduit" "need not also be 'confined and discrete.'"  Maui I, 24 F.Supp.3d at 999.[2]

By definition, the NPDES program only applies to additions of pollutants to navigable waters from point sources, not to additions from non-point sources.  When pollutants are added to navigable waters from a non-point source, states regulate the addition.  33 U.S.C. § 1342(a); Oregon Natural Resources Council v. U.S. Forest Service, 834 F.2d 842, 849 (9th Cir. 1987) ("Nonpoint sources, because of their very nature, are not regulated under the NPDES.  Instead, Congress addressed non-point sources of pollution in a separate portion of the Act which encourages states to develop areawide waste treatment management plans.").  This disparate treatment of discharges from point sources and non-point sources is "an organizational paradigm of the Act."  Or. Natural Desert Ass'n, 550 F.3d at 780.  Thus, contrary to the district court's analysis, "how" pollutants "get" to navigable water is the threshold question to consider when assessing whether the NPDES program applies.

Congress considered the "vexing nonpoint source problem[]" when it

---

[2]     In its liability determination, the district court disregarded the requirement that a "point source" be "confined and discrete" to conclude that "not … all conduits must be 'confined and discrete conveyances.'"  Maui I, 24 F.Supp.3d at 999.

6

amended the Clean Water Act in 1972 and decided not to apply the NPDES program to non-point sources. S. Rep. 95-370, at 10.[3] In its considerations, Congress recognized that many non-point sources of pollution are "beyond present technology of control," and those that are controllable are generally regulated by states through their land use controls. Id. at 9; S. Rep. No. 92-414, at 39 (1972); *see also* 117 Cong. Rec. 38,722, 38,825 (Nov. 2, 1971) (statement of Sen. Muskie) (explaining that "[t]here is no effective way as yet, other than land use control, by which you can intercept [non-point] runoff and control it in the way that you do a point source"). In the face of these concerns, Congress also recognized that "it is both necessary and appropriate to make a distinction as to the kinds of activities that are to be regulated by the Federal Government and the kinds of activities which are to be subject to some measure of local control." S. Rep. 95-370 at 10. Congress' "clear and precise" distinction between point sources, which are subject to the NPDES program, and non-point sources, which are subject to other regulatory programs, was intentional.

This Court, as well as other courts, have honored Congress' clear intent, and repeatedly recognize that the NPDES program and other Clean Water Act

---

[3]    *Amici* believe the statutory text is unambiguous, however, to the extent there is any ambiguity, the legislative history illustrates that Congress made a precise distinction between point and non-point sources. See Caminetti v. United States (1917) 242 U.S. 470, 490 (referring to legislative intent is appropriate to resolve ambiguity).

7

requirements apply only to the addition of pollutants to navigable waters from point sources, not from non-point sources.  See Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 505 (9th Cir. 2013); Greater Yellowstone Coalition v. Lewis, 628 F.3d 1143, 1153 (9th Cir. 2010); United States v. Plaza Health Lab., 3 F.3d 643, 646 (2d Cir. 1993); Sierra Club v. Abston Constr. Co., 620 F.2d 41, 45 (5th Cir. 1980).

In Greater Yellowstone Coalition,  for example, this Court determined that a discharge to surface water from a pit through the ground did not require a Section 401 certification, because "[t]he § 401 certification requirement applies only to discharges from point sources." Greater Yellowstone Coalition, 628 F.3d at 1153.[4]  The ground is not a "point source" because water traveling through the ground to a surface water is "not collected or channeled" even though the discharge may have originated from a point source.  Ibid.[5]

Consistent with the Ninth Circuit's recognition that the NPDES program

---

[4]    Mining pits have been found to be point sources in certain circumstances; however, when water travels through the ground and into surface water, the ultimate discharge from the ground to surface water does not qualify as a point source discharge.  Greater Yellowstone Coalition, 628 F.3d at 1153; see also Abston Constr. Co., 620 F.2d at 45 (water discharging from the top of a pit dug by miners into a creek constitutes a point source discharge).

[5]    Similarly, discharges of pollutants to surface water from utility poles, animals, and humans are non-point sources.  Ecological Rights Found. v. Pac. Gas & Elec. Co., 713 F.3d 502, 505 (9th Cir. 2013) (utility poles); Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1097-1099 (9th Cir. 1998) (cows); United States v. Plaza Health Lab., 3 F.3d 643, 646 (2d Cir. 1993) (humans).

applies only to discharges from point sources to navigable waters, the Fifth

Circuit also rejected the argument that liability arises under the Clean Water Act

whenever pollutants enter a waterway "regardless of how the pollutant found its

way from that original source to the waterway." Abston Constr., 620 F.2d at 44.

In rejecting this argument, the Fifth Circuit correctly recognized that "[t]he

focus of this Act is on the 'discernible, confined and discrete' conveyance of the

pollutant[.]" Ibid.  Absent a "discharge[] from [a] 'discernible, confined, and

discrete conveyance(s)' … into a navigable body of water[,]" there is no

liability under the Clean Water Act's NPDES program.  Id. at 45.

Using a novel theory it refers to as the "conduit theory," the district court

ignored the NPDES program's point source requirement and determined instead

that liability is triggered when pollutants reach navigable water, "regardless of

*how* they get there." Maui I, 24 F.Supp.3d at 1000.  However, *how* pollutants

enter navigable waters is the threshold question for the NPDES program.  See

Trustees for Alaska v. EPA, 749 F.2d 549, 558 (9th Cir. 1984); Abston Constr.

Co., 620 F.2d at 44; Greater Yellowstone Coalition, 628 F.3d at 1153.

Although the district court assumed that the County's injection wells are

point sources, Maui I, 24 F.Supp.3d at 989,[6] and recognized that the wells do

---

[6]     Several provisions in the Clean Water Act raise questions about whether
wells are covered by the NPDES program.  Sections 208 and 304 of the Clean
Water Act treat disposal of pollutants in wells and subsurface excavations as

not add pollutants directly to a navigable water, it concluded nonetheless that the NPDES program applies because pollutants actually enter navigable waters. Id. at 996 ("It is the migration of the pollutant into navigable-in-fact water that brings groundwater under the Clean Water Act."). In reaching this conclusion, the district court acknowledged that no controlling appellate law or statutory text supports the application of the NPDES program through the so-called conduit theory. Ibid.

There is no support for the conduit theory because there is no basis in the Act, its legislative history or caselaw for such an approach. As explained above, the NPDES program only applies when there is an addition of a pollutant to navigable water from a point source. 33 U.S.C. §§ 1311(a), 1342(12); 1362; 40 C.F.R. § 122.2. The district court imposed liability based on the indirect migration of pollutants to the ocean from diffuse groundwater, without identifying a discharge to navigable water directly from a "confined and discrete" point source. Maui I, 24 F.Supp.3d at 997-98; see ER 410 (diffuse flow has no identifiable discharge point); ER 534, 537, 544, 593 (¶ 24), 599-601

---

non-point sources subject to state regulatory programs. 33 U.S.C. §§ 1288(b)(2)(K) (treating disposal of pollutants on land or in subsurface excavations as part of state areawide waste treatment management plan), 1314(f)(D)(2) (describing disposal of pollutants in wells or in subsurface excavations as "nonpoint sources of pollution"). The NPDES program also distinguishes "the disposal of pollutants into wells" which is subject to state regulation, 33 U.S.C. § 1342(b)(1)(D), from the general discharge of pollutants to navigable waters, which is subject to an NPDES permit, 33 U.S.C. § 1342(a).

(¶ 37) (seeps are ephemeral).  There is no factual or legal basis for applying the

NPDES program to non-point source discharges to navigable waters.  For this

reason, the district court's decision must be reversed.

**B.    The Conduit Theory Confuses Point Source Analysis with the Significant Nexus Test and Waters of the United States Jurisprudence**

Despite the lack of legal support for its approach, Maui I, 24 F.Supp.3d at

996, the district court relied on cases it believed applied the NPDES program to

indirect discharges.  See id. at 994-1000.[7]  The district court's fundamental

error, however, was to apply the "significant nexus" test for assessing whether a

water qualifies as a "waters of the United States" to the question of whether the

County was adding pollutants to navigable waters from a point source.  Id. at

1001 ("the indirect discharge theory does not treat groundwater as itself 'water

of the United States,' but as a conduit to such water").[8]

-------------------------

[7]    Citing to Rapanos v. United States, 547 U.S. 71 (2006); Solid Waste Agency of N. Cook Cnty v. U.S. Army Corps of Engineers, 531 U.S. 159 (2001), in N. Cal. River Watch v. City of Healdsburg, 496 F.3d 993, 1000 (9th Cir. 2007), Williams Pipe Line Co. v. Bayer Corp., 964 F.Supp. 1300 (S.D. Iowa 1997), Wash. Wilderness Coal. v. Hecla Min. Co., 870 F.Supp. 983 (E.D. Wash. 1994), United States v. Earth Sciences, Inc., 599 F.2d 368 (10th Cir. 1979).

[8]    As the Supreme Court noted in Lingle v. Chevron U.S.A., it is inappropriate to transmute a test applicable in one context into a different context with its own applicable test.  Lingle v. Chevron U.S.A., 544 U.S. 528 (2005).  Lingle overturned the transmutation of the "substantially advances" test, applicable in due process challenges, into the context of a regulatory takings challenge.  Id. at 544.  The Supreme Court noted that using a due

11

The "significant nexus" test was developed in the "waters of the United States" context and is used to determine when discharges to wetlands that are not traditionally navigable waters are still discharges to waters of the United States. Rapanos v. United States, 547 U.S. 715, 767 (2006) (Kennedy, J., concurring). When a point source discharges to a wetland, it may become necessary to determine whether a "significant nexus" between the non-navigable wetland and traditional navigable waters brings the wetland within the Clean Water Act's definition of "water of the United States." Ibid. If so, point source discharges into that wetland may be subject to the NPDES program because there is a discharge from a point source to a water of the United States. Ibid.

The "significant nexus" test does not determine whether there has been a discharge from a point source or bring a wetland, or any other waterbody, within the Act's definition of "point source." The district court's decision, however, misapplies the "significant nexus" test (which considers indirect impacts) to the question of whether there has been a discharge from a point

---

process test in this manner is "not only doctrinally untenable as a takings test -- its application as such would also present serious practical difficulties." Ibid. Here, the district court misappropriated the "significant nexus" test for "waters of the United States" in the wholly separate "point source" context, a mixing of analytical approaches discouraged by the Supreme Court. As in Lingle, such a misapplication of different Clean Water Act approaches is doctrinally untenable and creates immense practical challenges.

12

source (which focuses on direct, not indirect, non-point source discharges).[9]

As noted above, the line between point and non-point sources delineates the scope of the NPDES program. Dombeck, 172 F.3d at 1096-97. The danger in the district court's reliance on cases applying the "significant nexus" test is that application of the test in the point source context eliminates the line between point and non-point sources and applies the NPDES program to any migration of pollutants to navigable waters, regardless of *how* the pollutants get to navigable waters.

### C.   The Groundwater at Issue is Neither a Water of the United States nor a Point Source

There appears to be no dispute that the groundwater at issue in this case is not "waters of the United States;" and the district court did not hold otherwise.[10]

Maui I, 24 F.Supp.3d at 996 ("An unpermitted discharge into the groundwater,

---

[9]      For the same reason, the district court's reliance on Healdsburg, 496 F.3d 993 is misplaced. Maui I, 24 F.Supp.3d at 1000-1005. Healdsburg applied the significant nexus test to the question of whether discharges to Basalt Pond were discharges to a navigable water. Healdsburg, 496 F.3d at 995. This Court determined that the hydrologic connection between Basalt Pond and the Russian River qualified Basalt Pond as a navigable water. Healdsburg did not address the point source question.

[10]      The Act's language, structure and legislative history supports the exclusion of groundwater from regulation under the NPDES program. 40 C.F.R. § 122.2 (explicitly excluding groundwater from the definition of water of the United States). As noted in the extensive discussion on the Act's legislative history in Umatilla Waterquality Protective Ass'n v. Smith Frozen Foods, Inc., both the House and the Senate considered and declined to extend the Act to groundwater, in part, because "the jurisdiction regarding groundwaters is so complex." 962 F. Supp. 1312, 1316-1319 (D. Or. 1997).

13

without more, does not constitute a violation of the Clean Water Act").  Circuit

Court cases considering whether groundwater is a water of the United States

correctly conclude it is not.[11]  The district court's determination that the

groundwater at issue is not a water of the United States is thus correct.

 The groundwater here is also not a point source.  33 U.S.C. 1362(14); 40

C.F.R. § 122.2.  Despite the district court's reliance on the groundwater at issue

functioning as a "conduit," the court declined to rule that the groundwater is a

"point source."  Maui II, 2015 U.S. Dist. LEXIS 82395 at *18 ("[t]his court did

not rely on the proposition that the groundwater in this case served as a point

source.")  The district court properly concluded that the groundwater here is not

a point source.

---

[11] See Rice v. Harken Exploration Co., 250 F.3d 264, 272 (5th Cir. 2001)
("We must construe the [Act] in such a way as to respect Congress's decision to
leave the regulation of groundwater to the States"); Vill. Of Oconomowoc Lake
v. Dayton Hudson Corp., 24 F.3d 962, 966 (7th Cir. 1994) ("As the statute and
regulations stand, however, the federal government has not asserted a claim of
authority over artificial ponds that drain into ground waters");  Exxon Corp. v.
Train, 554 F.2d 1310, 1322 (5th Cir. 1977) ("the legislative history … belies an
intention to impose direct federal control over any phase of pollution of
subsurface waters. Instead, the congressional plan was to leave control over
subsurface pollution to the states").  Although some district court cases reach
the opposite conclusion, they do so by ignoring the Act's language, structure,
and legislative history to focus on the Act's broader goals – often to achieve the
outcome-oriented result of avoiding dismissal or to deny summary judgment.
See, e.g., Coldani v. Hamm, No. 07-660, 2007 WL 2345016; 2007 U.S. Dist.
LEXIS 62644 (E.D. Cal. 2007) (denying motion to dismiss); Idaho Rural
Council v. Bosma, 143 F.Supp.2d 1169 (D. Idaho 2001) (denying summary
judgment); Williams Pipe Line Co., 964 F.Supp. at 1319 (finding Hecla
persuasive); Hecla, 870 F.Supp. at 991 (denying motion to dismiss).

Because the groundwater at issue is not a navigable water, <u>Maui I</u>, 24 F.Supp.3d at 996, or a point source, <u>Maui II</u>, 2015 U.S. Dist. LEXIS 82395 at *18, and because the "conduit theory" has no textual, legislative or case law support, there is no tenable legal or factual basis for applying the NPDES program to migrations from the County's wells. <u>See</u> 33 U.S.C. §§1311(a), 1342; 1362; 40 C.F.R. § 122.2. Accordingly, the district court's ruling should be reversed.

## II. **EXPANDING THE NPDES PROGRAM TO THE MIGRATION OF POLLUTANTS THROUGH GROUNDWATER REWRITES THE EXISTING REGULATORY SCHEME, RESULTS IN AN INFEASIBLE PROGRAM AND UNDERMINES INNOVATIVE APPROACHES TO WATER MANAGEMENT**

If upheld, the district court's decision will intrude on the extensive field of existing groundwater regulation, result in an overlapping and unnecessary regulatory regime, create regulatory uncertainty, and threaten *amici*'s members' operation of important water, wastewater, stormwater, flood control, and water conservation projects. It should, therefore, be reversed.

### A. **Expansion of the Act Overburdens Existing Groundwater Regulatory Structures**

The area of groundwater regulation is already occupied by multiple federal and state laws. <u>See, e.g.</u>, 42 U.S.C. § 300f, <u>et seq.</u>; 40 C.F.R. 144.1 <u>et seq.</u>; 42 U.S.C. 6901, <u>et seq.</u>; 42 U.S.C. 9601, <u>et seq.</u>; 7 U.S.C. 136, <u>et seq.</u>;40 C.F.R. Parts 9, 141, and 142; Haw. Admin. Rules 13-168-1 <u>et seq.</u>; Cal. Water

Code § 10750 et seq.; Or. Rev. Stat. § 468B.150 et seq.; Wash. Admin. Code § 173-200 et seq.; Mo. Rev. Stat. § 644.061.1 et seq. The district court's decision will superimpose a regulatory scheme not designed to regulate groundwater on top of these laws and regulations, and in many cases, interfere with these laws and regulations.

### 1.    The District Court's Decision Interferes with Existing Federal Groundwater Regulations

By requiring NPDES permits for indirect discharges through groundwater, the district court adds unneeded duplication to the already extensive federal and state-administered regulatory schemes. Comprehensive federal laws, such as the Safe Drinking Water Act and its Underground Injection Control ("UIC") Program, 42 U.S.C. § 300f, et seq., 40 C.F.R. 144.1 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901, et seq., the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601, et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136, et seq., and EPA's Groundwater Rule, 40 C.F.R. Parts 9, 141, and 142, establish nationwide standards applicable to the discharge of pollutants to groundwater, injection wells, underground storage tanks, and groundwater quality. Together, these laws are specifically designed to prohibit the contamination of groundwater, regulate underground storage and injection of pollutants, limit the use of pollutants that may migrate into groundwater, and

16

impose significant liability for polluting groundwater.

For example, the wells at issue in this case have EPA- and State-issued UIC permits.  The Safe Drinking Water Act's UIC program addresses pollution of groundwater, by imposing construction, operation, monitoring and reporting requirements on discharges from the wells.  40 C.F.R. §§ 146.1-146.14, 144.25.  The direct disposal of waste into the wells is therefore fully regulated to prohibit migration of pollutants into underground sources of drinking water.  40 C.F.R. § 144.12.  If subject to the NPDES program, these same wells would be regulated by overlapping and even contradictory discharge, operation, monitoring, reporting and permitting requirements.  Cf., e.g., 40 C.F.R. § 122.41-122.50 (NPDES requirements) with 40 C.F.R. §§ 146.1-146.14 (UIC program regulations).  As described below, application of the NPDES program to these wells and other discharges to groundwater is impractical.  Congress did not intend this application.

2.    **The District Court's Decision Interferes with State Law and State Authority Over Water Resources**

States also have extensive regulatory authority over groundwater and water supply through laws adopted pursuant to state land use, waste disposal, water quality, well drilling, and other reserved authority.  In accordance with the Supremacy Clause, such state programs must be consistent with federal programs, but are otherwise independent regulatory schemes.  Virginia v.

17

Browner, 80 F.3d 869, 882-883 (4th Cir. 1996).  Within this context, state laws

regulate the spacing, drilling, construction, operation, and abandonment of

wells, as well as pumping of groundwater.  They establish standards for water

supply, wastewater management and quality, and discharges of storm flows

from property into groundwater.  See, e.g., Haw. Rev. Stat. § 340E-2 et seq.

(drinking water regulations); Cal. Water Code § 13000 et seq. (water quality

control); Or. Admin. Rules § 340-041-001 et seq. (water quality standards:

beneficial uses, policies and criteria).

        Congress preserved the states' central role in water management when it

adopted the Clean Water Act.[12]  The U.S. Supreme Court, this Court, and the

EPA recognize that the states' role should not be compromised.[13]  Protection of

---

[12]     33 U.S.C. §§1251(b), (g) ("the authority of each State to allocate
quantities of water within its jurisdiction shall not be superseded, abrogated or
otherwise impaired by this chapter," and "nothing in this chapter shall be
construed to supersede or abrogate rights to quantities of water which have been
established by any State."); 1370 (the Act "shall [not] be construed as impairing
or in any manner affecting any right or jurisdiction of the States with respect to
the waters . . . of such States."); United States v. Appalachian Elec. Power Co.,
311 U.S. 377, 406 (1940) (describing federal power to regulate navigable
waters); The Daniel Ball, 77 U.S. 557, 563 (1870) (same); California v. United
States, 438 U.S. 645, 662 (1978) (describing states' traditional authority to
regulate water); California Oregon Power Co. v. Beaver Portland Cement Co.,
295 U.S. 142, 158, 163-164 (1935) (same).
[13]     S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95,
107 (2004) ("the authority of each State to allocate quantities of water within its
jurisdiction shall not be superseded, abrogated or otherwise impaired by the
Act") (internal citations omitted); Great Basin Mine Watch v. Hankins, 456 F.3d
955, 963(9th Cir. 2006) (same).

state authority under the Clean Water Act is especially important for projects undertaken by *amici*'s members, which develop and protect reliable water supplies in a complex regulatory structure and in an increasingly water-scarce environment.

Extending the NPDES program to apply to groundwater through the conduit theory adds another layer of regulation to a comprehensively regulated field, increases the burden on regulatory agencies to administer yet another permitting program, and creates inevitable conflicts between the expanded NPDES program and state regulation of water supply. For this reason, the Court should reverse the district court's decision.

**B.    Implementation of the NPDES Program in the Groundwater Context Would be Infeasible**

Implementing the NPDES program whenever a pollutant migrates into navigable waters through groundwater is infeasible and leads to the absurd result that every discharge to land, air, non-navigable surface water and groundwater may require an NPDES permit. See Ariz. State Bd. for Charter Schools v. U.S. Dep't of Educ., 464 F.3d 1003, 1008 (9th Cir. 2006) ("statutory interpretations which would produce absurd results are to be avoided."); see also 131 Cong. Rec. 15,616, 15,657 (June 13, 1985) (declaring it "absurd" to "require everyone who has a device to divert, gather, or collect stormwater runoff and snowmelt to get a permit from EPA as a point source" and warning

19

that such a permitting program "would be an administrative nightmare [and] …
prohibitively expensive to administer.").

### 1.    Diffuse Points of Discharge are Difficult or Impossible to Locate

Groundwater often has diffuse, unascertainable or ephemeral points of discharge, making it nearly impossible to know in advance whether, when or where a discharge from groundwater to navigable waters will occur.  See, e.g., ER 410; (diffuse flows have no identifiable entry point); 534, 537, 544, 593 (¶ 24), 599-601 (¶ 37) (seeps are small and ephemeral).  The uncertainty surrounding whether a particular pollutant will ever discharge from groundwater to a navigable water creates a situation where *amici*'s members and their permitting agencies will not know if an NPDES permit is required until after a discharge commences.  The uncertainty also makes it infeasible to determine when, where, and how compliance is measured when there is "no confined and discrete" point of discharge from groundwater to a navigable water.

Courts recognize that it may be impossible to predict, regulate or control the discharge of a pollutant from groundwater to a navigable water.  See Greater Yellowstone Coal, 641 F.Supp.2d at 1141 ("The Court can also envision future monitoring and enforcement issues.  How do you accurately decide if the contamination originated from this source, or perhaps another source.").  Applying the NPDES program in a context where a discharge point is

20

unascertainable or ephemeral is infeasible.  In light of the civil and criminal

penalties applicable to violations of the NPDES program, the rule of lenity

compels a narrow construction of "point source" and rejection of the expansive

and unsupported "conduit theory."  See Plaza Health Labs, 3 F.3d at 649;

Kasten v. Saint-Gobain Performance Plastics Corp., 131 S. Ct. 1325, 1336

(2011).

> **2.    Physical Differences between Surface and Groundwater Make Permit Requirements Impossible to Formulate and Implement**

Differences between hydrologic conditions in groundwater and surface

water limit regulators' and dischargers' ability to implement the NPDES

program in the groundwater context.  Important features unique to groundwater

include subsurface geology; multiple and diffuse points of discharge; other

sources of pollution such as pollutant plumes; chemical reactions related to the

groundwater geology that may alter the nature of a pollutant once it enters a

groundwater formation; saltwater intrusion; and "naturally occurring" elements

that qualify as "pollutants" under the Clean Water Act (e.g., selenium or

arsenic).[14]

---

[14]    See, e.g., 80 Fed. Reg. 63552 (2015) (Reopening of Request for Scientific Views on the Draft Aquatic Life Ambient Water Quality Criterion for Selenium--Freshwater 2015); Pac. Coast Fedn. of Fishermen's Ass'ns v. Glaser, 2013 U.S. Dist. LEXIS 132240 at *21 (E.D. Cal. Sept. 16, 2013) ("discharges [containing naturally-occurring selenium] would otherwise … require an

Water quality based effluent limits ("WQBELs") provide one example of how the differences between groundwater and surface water make it infeasible to implement the NPDES program's requirements to groundwater. Section 122.44 of 40 C.F.R. requires NPDES permits to include WQBELs if there is a reasonable potential that a discharge will interfere with water quality standards. 40 C.F.R. 122.44(a). Development of effluent limitations requires, in part, characterization of the effluent flow, flow variability, pollutant concentration, and stormwater influence within the navigable waters that receive the discharge. See 33 U.S.C. § 1311(e); 40 C.F.R.§ 122.44; U.S. EPA, NPDES Permit Writer's Manual 2010: 6-12 – 6-22.

Characterizing the flow of groundwater or the influence of stormwater on groundwater discharges to navigable waters poses significant challenges, especially where groundwater has ephemeral seeps or diffuse discharges. This is the case here, where 90% of the submarine groundwater migrates to the ocean through diffuse flow and 10% migrates through ephemeral seeps. ER 493 (¶ 48), 534, 537, 544, 593 (¶ 24), 599-601 (¶ 37). In addition, as the groundwater at issue flows toward the ocean, it encounters sedimentary capstone formations, leaches nutrients along the flow path, and mixes with saltwater. State of Hawai'i Department of Health, U.S. EPA, and U.S. Army

---

NPDES permit").

Engineer Research and Development Center, Lahaina Groundwater Tracer Study, 60-61 (Nov. 2012).[15]  These types of interactions often result in the groundwater accumulating naturally occurring "pollutants," making effluent limitations impractical: WQBELS do not reduce naturally occurring pollutants.

Similarly, implementing other NPDES permit requirements, such as outfall monitoring (as illustrated here, groundwater generally does not generally have a discernible outfall), 40 C.F.R. § 122.21(j)(4)(i), reporting of noncompliant discharges (no "person" discharges naturally occurring arsenic or selenium, for example) 40 C.F.R. § 122.41(l), and enforcement of discharge violations would likewise be infeasible.

The complexity surrounding subsurface waters was one of the driving factors for Congress' intentional exclusion of groundwater from the Clean Water Act's NPDES program.[16]  Additional complexity resulting from the conduit theory will overburden regulatory agencies and the regulated community.  Uncertainty and complexity justified exclusion of groundwater from the Act since at least the congressional hearings in 1971, and justifies this Court's reversal of the district court's decision here.

---

[15]     Available at https://www3.epa.gov/region9/water/groundwater/uic-pdfs/lahaina02/lahaina-gw-tracer-study-final-report-june-2013.pdf.  Per Hawai'i District Court Local Rule 10.2(d), portions of this Study were filed in the district court at DE 79-10, 79-20, 89-4, 127-2, 129-3, 137-4, 139-10, 141-7, 155-5, 173-34, 217-5.
[16]     See footnote 10, above.

**C.** **The District Court's Decision Improperly Exposes *Amici*'s Members to Liability for Lawful Operations Critical to Public Health and Safety**

Long-term, the district court's decision will delay or prevent *amici*'s members' water supply, conservation, treatment and management projects, which directly benefit the public, by requiring compliance with impractical permits and exposing members to enforcement actions and citizen suits.

**1.** **Groundwater Recharge**

The western United States has experienced drought conditions since at least 2013. Water purveyors throughout the region are developing new water sources and new storage facilities to preserve and augment supplies. A major part of that effort is using subsurface aquifers to store water and highly treated recycled wastewater for potential use in water supply systems, consistent with water quality standards. To protect raw water in aquifers from saltwater intrusion, some members of *amici* also inject recycled and potable water into groundwater basins to create a barrier between saltwater and freshwater. Groundwater storage allows water supply agencies to increase water storage and reduce losses from evaporation. Under the district court's reasoning, if water, which an agency puts into the ground as part of a groundwater recharge project, migrates to "waters of the United States," it will require an NPDES permit in addition to other permits already applicable to the projects.

24

Requiring an NPDES permit will put existing and future recharge projects at risk.  As described above, hydrologic conditions unique to the groundwater setting make implementing the NPDES program infeasible for groundwater recharge projects.  If the Court upholds the district court's rationale, regulatory authorities across the Ninth Circuit will be forced to issue NPDES permits for groundwater recharge projects without the ability to develop appropriate or attainable permit requirements.  *Amici*'s members will be at risk of either having an unachievable permit imposed on their operations, or being sued for operating without a permit.  Such open-ended liability will be a major disincentive for investment in new groundwater recharge projects.

## 2.     Other Recycled Water

Other uses of recycled water will also be put at risk by the district court's decision.  Land application (for irrigation purposes) and impoundment of recycled water (for other supply purposes) where it can seep into the ground, then to navigable waters, may trigger NPDES requirements under the district court's decision.  See, e.g., Cal. Code Regs., tit. 22, div. 4; Or. Admin. Rules, 340-055 et seq.; Wash. Admin. Code, Ch. 173-219; Tx. Admin. Code, tit. 30, Pt. 1, Ch. 210.  Requiring *amici*'s members, individual property owners and other recycled water users to obtain an NPDES permit, in addition to all other permits for recycled water use, will significantly slow and complicate the

25

regulatory process, reducing the use of recycled water.  States and the EPA are encouraging new recycled water projects as part of protecting our nation's waters.  Imposing NPDES requirements by upholding the district court's decision will disincentive recycled water projects and run contrary to state and federal policy.

### 3.    Other Water Supply Infrastructure

Water supply *amici* also own and operate surface water impoundments, such as terminal reservoirs, and subsurface water pipelines that often percolate and leak water into the surrounding groundwater.[17]  Determining the point of discharge from reservoirs and underground pipelines, as well as which NPDES permit requirements should apply to infrastructure with thousands of points of discharge is not feasible or within the scope of the Act.  The conduit theory thus compromises the continued operation of water supply storage facilities and pipelines.

### 4.    Low Impact Development and Green Infrastructure

Many of *amici*'s members operate municipal separate storm sewer

---

[17]    Potable water is often considered a pollutant.  See, e.g., W.R. Grace & Co. v. United States EPA, 261 F.3d 330, 333 (3d Cir. 2001) (describing disinfection process creating chloramines to inactivate bacteria); see also, California State Water Resources Control Board Order No. WQ 2014-0194-DWQ, Statewide National Pollutant Discharge Elimination System Permit for Drinking Water System Discharges to Waters of the United States (Nov. 18, 2014).

systems ("MS4"), and are subject to NPDES permits specific to MS4s.  33

U.S.C. 1342(p)(3)(B); 40 C.F.R. 122.26.  These permits require agencies across

the country to use LID infrastructure to retain, percolate and infiltrate

stormwater.[18]  The district court's decision would expose these agencies to

liability for infiltrating stormwater as required by their MS4 permits and the

EPA.  It would also apply to individual property owners who install similar LID

infrastructure as part of new development or redevelopment.

    In addition, communities nationwide are undertaking massive upgrades to

their sewer systems to reduce combined sewer overflows ("CSOs").  An

estimated 10 trillion gallons of stormwater rushes off rooftops, roadways,

parking lots, and other impervious surfaces.[19]  In areas with combined sewers,

stormwater combines with sanitary flows, often overwhelming the sewer

system, and causing overflows of untreated water and wastewater into

---

[18]     See, e.g., U.S. EPA, Memorandum: Protecting Water Quality with Green Infrastructure in EPA Permitting and Enforcement Programs, Apr. 20, 2011; see also, Los Angeles Regional Water Quality Control Board Order No. R4-2012-0175, NPDES Permit No. CAS004001, Waste Discharge Requirements for Municipal Separate Storm Sewer System (MS4) Discharges Within the Coastal Watersheds of Los Angeles County, Except Those Discharges Originating From the City of Long Beach MS4, (Nov. 8, 2012) Provision VI.D.7.c.i (requiring new development and redevelopment projects to retain on-site stormwater runoff from the 0.75-inch , 24-hour rain event or the 85th percentile, 24-hour rain event).
[19]     See Natural Resources Defense Council, Rooftops to Rivers II: Green Strategies for Controlling Stormwater and Combined Sewer Overflows, http://www.nrdc.org/water/pollution/rooftopsII/default.asp (October 2013).

27

waterways. Wastewater utilities have begun using green infrastructure projects to slow the flow of stormwater, to prevent stormwater from entering the sewer system, and to reduce the occurrence of CSOs.

State and federal regulators and the regulated community rely on LID and green infrastructure to treat stormwater pollution and prevent untreated wastewater from entering the nation's waters. The district court's decision would deal a major blow to these efforts.

**5.      Regulatory Enforcement and Third Party Lawsuits**

Not only is it often unclear whether and where discharges from groundwater enter a navigable water, in the case of exfiltration from underground pipes, it is nearly impossible to determine whether and where discharges from pipes enter groundwater. In the event a regulatory agency determines an NPDES permit is not required for a water or wastewater system, reservoir, or other project, but later evidence demonstrates a discharge from groundwater to a water of the United States, dischargers may face crippling liability. See 33 U.S.C. § 1365. Even if all of *amici's* members sought NPDES permits for their potential discharges to groundwater, developing specific permit standards is infeasible (see Section II.B, above); poorly written requirements could put dischargers immediately out of compliance, expose them to citizen suit liability and enforcement actions, and provide no possibility of attaining

28

compliance.

The district court's decision would therefore create a new, burdensome and impractical regulatory program, expose *amici's* members' to significant liability for their lawful operations, and compromise water supply and management across the country.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the district court's decision should be reversed.

///

///

///

///

Dated:    March 28, 2016    Respectfully submitted,

By:   */s/ Shawn Hagerty*
      RODERICK E. WALSTON
      SHAWN HAGERTY
      ANDRE MONETTE
      REBECCA ANDREWS
      Attorneys for *Amici Curiae*
      Association of California Water
      Agencies, California Association of
      Sanitation Agencies, California State
      Association of Counties, International
      Municipal Lawyers Association,
      League of California Cities, National
      Association of Clean Water Agencies,
      National Association of Counties,
      National League of Cities, National
      Water Resources Association

30

## CERTIFICATE OF COMPLIANCE

In accordance with the Federal Rules of Appellate Procedure, rule 32(a)(7) and Ninth Circuit Rule 32-1, I, Shawn Hagerty, hereby certify that the foregoing was produced on a computer, is proportionately spaced, has a typeface 14 points or more and, according to the word count function on the word processing program used, this brief contains 6,726 words.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this certificate is dated March 28, 2016.

/s/ *Shawn Hagerty*
SHAWN HAGERTY

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed:

**AMICI CURIAE BRIEF OF THE ASSOCIATION OF CALIFORNIA WATER AGENCIES, CALIFORNIA ASSOCIATION OF SANITATION AGENCIES, CALIFORNIA STATE ASSOCIATION OF COUNTIES, INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, LEAGUE OF CALIFORNIA CITIES, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES, NATIONAL ASSOCIATION OF COUNTIES, NATIONAL LEAGUE OF CITIES, NATIONAL WATER RESOURCES ASSOCIATION IN SUPPORT OF DEFENDANT AND APPELLANT COUNTY OF MAUI AND IN SUPPORT OF REVERSAL OF THE DISTRICT COURT'S DECISION** with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/ECF System on March 28, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

**Plaintiffs/Appellees**

David Henkin, Esq.
Summer Kupau-Odo, Esq.
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, HI 93813

1

**County of Maui**

Patrick K. Wong
Richelle M. Thomson
200 South Hight Street
Wailuku, Maui, Hawai'i 76793
Phone:  (808) 270-7740

**Hunton & Williams LLP**

Michael R. Shebelskie
951 East Byrd Street
Richmond, Virginia 23219
Phone (904) 788-8716

Colleen P. Doyle
550 South Hope Street, Suite 2000
Los Angeles, CA 90071
Phone:  (213) 532-2000

Executed on March 28, 2016 at Walnut Creek, California.

*/S/ Irene Islas*
Irene Islas

2

## __Exhibit C__

Motion of the Association of American Railroads; American Farm Bureau
Federation; American Iron and Steel Institute; American Petroleum Institute;
National Association of Manufacturers; National Mining Association; The
Fertilizer Institute; and Utility Water Act Group for Leave to File Brief as *Amicus
Curiae* in Support of Defendant-Appellant

# No. 15-17447

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

HAWAII WILDLIFE FUND; SIERRA CLUB – MAUI GROUP; SURFRIDER
FOUNDATION; and WEST MAUI PRESERVATION ASSOCIATION,
*Plaintiffs-Appellees,*

v.

COUNTY OF MAUI,
*Defendant-Appellant,*

———————————

*On Appeal from the United States District Court for the District of Hawai'i*

# MOTION OF THE ASSOCIATION OF AMERICAN RAILROADS; AMERICAN FARM BUREAU FEDERATION; AMERICAN IRON AND STEEL INSTITUTE; AMERICAN PETROLEUM INSTITUTE; NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL MINING ASSOCIATION; THE FERTILIZER INSTITUTE; AND UTILITY WATER ACT GROUP FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

Pursuant to Federal Rule of Appellate Procedure 29(b), the Association of

American Railroads, American Farm Bureau Federation, American Iron and Steel

Institute, American Petroleum Institute, National Association of Manufacturers,

National Mining Association, The Fertilizer Institute, and Utility Water Act Group

1

respectfully request leave to file an *amicus* brief in support of the Defendant-Appellant in this case.  The Defendant-Appellant challenges the district court's ruling that disposal of pollutants into groundwater (via well injection) requires a Clean Water Act ("CWA") Section 402 permit merely because groundwater containing injected pollutants eventually migrates to the ocean.  If affirmed, the district court's interpretation could potentially expand the scope of the Section 402 permitting program to encompass nonpoint sources of pollution that Congress never intended to be subject to Section 402 requirements.  Such an expansion could have significant practical implications for both permitting authorities and the regulated community, including *amici*'s members.

Amici's participation in this appeal is desirable and will aid the Court's disposition of this appeal because, as explained below, *amici* and their counsel have extensive experience in cases involving the proper interpretation and regulatory scope of CWA Section 402.  *Amici* can also offer the broad perspective of their members—many of whom are subject to Section 402 permitting requirements—on the issues in this case.  Finally, some of *amici*'s members have recently litigated, and continue to litigate, similar cases in other courts that could be directly affected by the outcome of this appeal.

Pursuant to Ninth Circuit Rule 29-3, *amici* can state that the Defendant-Appellant consents to this filing, but the Plaintiffs-Appellees do not consent.[1]

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* are a coalition of trade associations whose members represent a broad spectrum of the Nation's agricultural, commercial, and industrial operations. They are the Association of American Railroads; American Farm Bureau Federation; American Iron and Steel Institute; American Petroleum Institute; National Association of Manufacturers; National Mining Association; The Fertilizer Institute; and Utility Water Act Group.

Association of American Railroads ("AAR") is an incorporated, nonprofit trade association representing the nation's major freight railroads, many smaller railroads, Amtrak, and several commuter railroads. AAR's members operate approximately 76 percent of the rail industry's line haul mileage, produce 96 percent of its freight revenues, and employ 93 percent of rail employees.

---

[1] *Amici* affirm, in accordance with Federal Rule of Appellate Procedure 29(c)(5), that no counsel for a party authored this brief in whole or in part and that no person other than the *amici*, their members, or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

American Farm Bureau Federation ("AFBF"), a not-for-profit, voluntary general farm organization, was founded to protect, promote, and represent the business, economic, social, and educational interests of American farmers and ranchers. AFBF has member organizations in all 50 states and Puerto Rico, representing about six million member families.

American Iron and Steel Institute ("AISI") serves as the voice of the North American steel industry. AISI is comprised of 19 member companies, including integrated and electric furnace steelmakers, and approximately 124 associate members who are suppliers to or customers of the steel industry. AISI's member companies represent over 75 percent of both U.S. and North American steel capacity.

American Petroleum Institute is a nationwide, non-profit trade association that represents over 650 companies involved in all aspects of the petroleum and natural gas industry, from the largest integrated companies to the smallest independent oil and gas producers.

National Association of Manufacturers is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12 million men and women, contributes roughly $2.17 trillion to the U.S. economy annually,

4

has the largest economic impact of any major sector, and accounts for three-quarters of private-sector research and development.

National Mining Association ("NMA") is a national trade association whose members produce most of America's metals, coal, and industrial and agricultural minerals. NMA's membership also includes manufacturers of mining and mineral processing machinery and supplies, transporters, financial and engineering firms, and other businesses involved in the nation's mining industries.

The Fertilizer Institute is the leading voice in the fertilizer industry, representing the public policy, communication, and statistical needs of its members, including producers, manufacturers, retailers, and transporters of fertilizer.

Utility Water Act Group ("UWAG") is a voluntary, *ad hoc*, non-profit, unincorporated group of 210 individual companies and three national trade associations of energy companies: the Edison Electric Institute, the National Rural Electric Cooperative Association, and the American Public Power Association. UWAG and its trade association members' utility members generate and deliver the vast majority of electricity used by residential, business, and government customers throughout the country.

*Amici*'s members often require CWA Section 402 permits, known as National Pollutant Discharge Elimination System ("NPDES") permits, to conduct their operations. However, they also engage in other conduct that is not currently subject to NPDES permitting but could potentially require such permits in the future if the district court's novel and overreaching "conduit theory" of CWA liability stands. Under that theory, an NPDES permit would be required any time pollutants are released from any structure that falls within the CWA's definition of "point source" (*e.g.*, pipes, containers, wells, channels, rolling stock, etc.) and eventually reach a navigable water, irrespective of mode or duration of migration.

The "conduit theory" could open the door to claims of federal CWA liability for any pollutants released from the innumerable "point sources" under *amici*'s control that might eventually find their way to navigable waters, whether by groundwater, air, surface runoff, or other means. This could greatly expand the universe of potentially permitted sources. Moreover, there is no way that *amici*'s members can be certain of when NPDES permits are required, as even detailed technical studies may not provide a definitive answer concerning a pollutant's ultimate fate. And *amici*'s members who draw the wrong conclusions about the ultimate fate of pollutants leaving their property could face harsh civil and criminal penalties under the CWA. Thus, as a practical matter, *amici*'s members may face

6

expanded or new NPDES permit requirements under this novel theory, thereby incurring significant expense, delay, and operational restrictions.

For these reasons, *amici*'s members have a substantial interest in this matter.

## ARGUMENT

*Amici*'s participation in this appeal is desirable and will benefit the Court through *amici*'s broad perspective and extensive experience on CWA issues. *Amici* regularly file briefs in cases addressing the proper interpretation and regulatory scope of CWA Section 402 (33 U.S.C. § 1342). *See, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326 (2013); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502 (9th Cir. 2013); *Catskill Mountains v. U.S. EPA*, No. 14-1823(L) (2d Cir. filed June 2, 2014). Given *amici*'s experience in these types of cases, they are uniquely positioned to inform the Court about the ramifications of misinterpreting the statute.

*Amici* are also well positioned to provide their perspectives on the broad practical implications of the district court's "conduit theory." The district court's novel theory of CWA liability eliminates the important distinction that Congress drew between point sources that are subject to NPDES permits and nonpoint sources that are to be addressed by state and local governments under other programs. Not only would the Defendant-Appellant's disposal of pollutants into

7

groundwater via well injection be swept into the permitting program, so might various other structures, facilities, and methods that *amici*'s members use to remove pollutants through infiltration and percolation, as well as windblown pollutants or surface runoff carrying pollutants from their structures, facilities, and land. If affirmed, the district court's ruling has the potential to greatly expand the scope of the NPDES program and thereby impose significant regulatory burdens and uncertainty on permitting authorities and the regulated community alike.

This Court should also accept the proposed *amicus* brief because *amici* have "an interest in some other case that may be affected by the decision in the present case." *In re Halo Wireless*, 684 F.3d 581, 596 (5th Cir. 2012) (quoting *Ryan v. CFTC*, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J., in chambers)). Indeed, several of *amici's* members are involved in recent and ongoing cases involving whether the eventual migration of pollutants through groundwater to navigable waters is subject to Section 402 permitting. *See, e.g.*, *Sierra Club v. Va. Elec. & Power Co.*, 2015 WL 6830301 (E.D. Va. Nov. 6, 2015); *Yadkin Riverkeeper v. Duke Energy Carolinas, LLC*, 2015 WL 6157706 (M.D.N.C. Oct. 20, 2015); *Ohio Valley Envtl. Coal., Inc. v. Pocahontas Land Corp.*, 2015 WL 2144905 (S.D. W.Va. May 7, 2015); *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc.*, 25 F. Supp. 3d 798 (E.D.N.C. 2014). Given their interests in these other cases,

8

*amici*'s proposed brief should be allowed here.  *See In re Halo Wireless*, 684 F.3d at 596.

## CONCLUSION

For the foregoing reasons, the Court should grant leave to file the accompanying *amicus* brief and should direct the Clerk to accept the proposed brief for filing.

DATED this 28th day of March, 2016.

 /s/ David Y. Chung

Kirsten L. Nathanson
Thomas A. Lorenzen
David Y. Chung
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 624-2500

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 28, 2016, I electronically filed a copy of the foregoing motion with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit via the appellate CM/ECF system, which will send electronic notification of to all registered CM/ECF users in this case.

/s/ David Y. Chung
David Y. Chung

# No. 15-17447

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

HAWAII WILDLIFE FUND; SIERRA CLUB – MAUI GROUP; SURFRIDER FOUNDATION; and WEST MAUI PRESERVATION ASSOCIATION,
*Plaintiffs-Appellees,*

v.

COUNTY OF MAUI,
*Defendant-Appellant,*

*On Appeal from the United States District Court for the District of Hawai'i*

## BRIEF *AMICUS CURIAE* OF THE ASSOCIATION OF AMERICAN RAILROADS; AMERICAN FARM BUREAU FEDERATION; AMERICAN IRON AND STEEL INSTITUTE; AMERICAN PETROLEUM INSTITUTE; NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL MINING ASSOCIATION; THE FERTILIZER INSTITUTE; AND UTILITY WATER ACT GROUP IN SUPPORT OF DEFENDANT-APPELLANT

Kirsten L. Nathanson
Thomas A. Lorenzen
David Y. Chung
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
dchung@crowell.com
(202) 624-2500

*Counsel for Amici Curiae*

# <u>RULE 26.1 DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 29(c), *amici* hereby certify

that none of them issues stock and none is owned, either in whole or in part, by any

publicly held corporation.

# **TABLE OF CONTENTS**

RULE 26.1 DISCLOSURE STATEMENT............................................................. i

TABLE OF CONTENTS............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF THE *AMICI CURIAE* ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...........................................................................................................8

    I.   The District Court's "Conduit Theory" Impermissibly Extends NPDES
        Requirements to Nonpoint Sources of Pollutants.........................................8

        A.   Congress Plainly Distinguished Between Point Source Discharges
             Subject to the NPDES Program and Nonpoint Sources of Pollutants
             that are Addressed Under Other Programs............................................9

        B.   The CWA Only Requires an NPDES Permit When Pollutants
             Reach Navigable Waters by Means of a Discernible, Confined, and
             Discrete Conveyance. .........................................................................12

        C.   Other Provisions of the CWA Confirm the NPDES Program Does
             Not Cover Diffuse Migration of Pollutants through Groundwater.......19

    II.  The CWA's Penalty Scheme Requires Rejection of the "Conduit
       Theory" ......................................................................................................22

    III. The Practical Implications of the District Court's "Conduit Theory"
       Could Be Staggering.................................................................................25

        A.   Under the "Conduit Theory," the NPDES Program Could Grow to
             an Unworkable Scale.............................................................................25

        B.   NPDES Requirements Cannot Be Applied to the Sorts of Features
             that Would Require Permits Under the "Conduit Theory." ..................31

CONCLUSION.......................................................................................................34

CERTIFICATE OF COMPLIANCE......................................................................35

CERTIFICATE OF SERVICE ...............................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Cmty. Action on Toxics v. Aurora Energy Servs.*,
  940 F. Supp. 2d 1005 (D. Alaska 2013), *rev'd on other grounds*,
  765 F.3d 1169 (9th Cir. 2014) ...............................................................16, 17

*Ariz. State Bd. for Charter Schools v. U.S. Dep't of Educ.*,
  464 F.3d 1003 (9th Cir. 2006) ...........................................................................25

*Blandino-Medina v. Holder*,
  712 F.3d 1338 (9th Cir. 2013) ...........................................................................8

*Catskill Mountains v. City of New York*,
  273 F.3d 481 (2d Cir. 2001) ..............................................................................14

*Cordiano v. Metacon Gun Club*,
  575 F.3d 199 (2d Cir. 2009) ..............................................................16, 17, 18

*EPA v. EME Homer City Generation, L.P.*,
  134 S. Ct. 1584 (2014)........................................................................................19

*FDA v. Brown & Williamson*,
  529 U.S. 120 (2000)............................................................................................19

*Greater Yellowstone Coal. v. Lewis*,
  628 F.3d 1143 (9th Cir. 2010) ...........................................................................13

*Hawai'i Wildlife Fund v. County of Maui*,
  2015 WL 328227 (D. Haw. Jan. 23, 2015).....................................................3, 4

*Hawai'i Wildlife Fund v. County of Maui*,
  24 F. Supp. 3d 980 (D. Haw. 2014)...........................................................*passim*

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
  131 S. Ct. 1325 (2011)........................................................................................24

*McNally v. United States*,
   482 U.S. 350 (1987)........................................................................23

*Nat'l Wildlife Fed'n v. Gorsuch*,
   693 F.2d 156 (D.C. Cir. 1982).................................................14, 15

*National Wildlife Fed'n v. Consumers Power Co.*,
   862 F.2d 580 (6th Cir. 1988) .......................................................14

*Or. Natural Desert Ass'n v. Dombeck*,
   172 F.3d 1092 (9th Cir. 1998) .....................................................10

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*,
   550 F.3d 778 (9th Cir. 2008) .............................................10, 11, 21

*Or. Natural Res. Council v. U.S. Forest Serv.*,
   834 F.2d 842 (9th Cir. 1987) .........................................................9

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*,
   541 U.S. 95 (2004)........................................................................20

*Sierra Club v. Abston Const. Co., Inc.*,
   620 F.2d 41 (5th Cir. 1980) ....................................................13, 14

*Trs. for Alaska v. EPA*,
   749 F.2d 549 (9th Cir. 1984) .......................................................16

*United States v. Bass*,
   404 U.S. 336 (1971)......................................................................23

*United States v. Fejes*,
   232 F.3d 696 (9th Cir. 2000) .......................................................25

*United States v. Granderson*,
   511 U.S. 39 (1994).....................................................................6, 25

*United States v. Kozminski*,
   487 U.S. 931 (1988)......................................................................23

*United States v. Plaza Health Labs, Inc.*,
   3 F.3d 643 (2d Cir. 1993) .......................................................15, 23

iv

## Statutes

33 U.S.C. § 1288 .................................................................10, 19, 20, 21

33 U.S.C. § 1288(b)(2) ...............................................................6, 20, 22

33 U.S.C. § 1311 ...................................................................................9

33 U.S.C. § 1311(a) ..........................................................................5, 9

33 U.S.C. § 1314(f) ....................................................10, 19, 20, 22

33 U.S.C. § 1314(f)(2) .......................................................................6

33 U.S.C. § 1314(f)(2)(D) ..............................................................20

33 U.S.C. § 1319(c) ....................................................................22, 23

33 U.S.C. § 1319(d) ..........................................................................23

33 U.S.C. § 1329 ........................................................................10, 20

33 U.S.C. § 1342 ....................................................................1, 9, 24

33 U.S.C. § 1342(a) ...........................................................................5

33 U.S.C. § 1342(a)(1) .......................................................................9

33 U.S.C. § 1362(12) ...........................................................5, 12, 15

33 U.S.C. § 1362(14) ......................................................................4, 9

33 U.S.C. § 1365(a) ..........................................................................23

## Regulations

40 C.F.R. Part 122 Subpart C. .....................................................32

40 C.F.R. § 122.45(a) ......................................................................31

## Other Authorities

117 Cong. Rec. 38,722 (Nov. 2, 1971) ....................................11

v

123 Cong. Rec. 38,924 (Dec. 15, 1977) ....................................................26

131 Cong. Rec. 15,616 (June 13, 1985).................................................26

133 Cong. Rec. H168 (daily ed. Jan. 8, 1987)........................................26

H.R. Rep. No. 92-911 (1972)...................................................................20

S. Rep. No. 92-414 (1972) .............................................................11, 20

S. Rep. No. 95-370 (1977) ...........................................................*passim*

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* are a coalition of trade associations whose members represent a broad spectrum of the Nation's agricultural, commercial, industrial, and transportation operations.  They are the Association of American Railroads; American Farm Bureau Federation; American Iron and Steel Institute; American Petroleum Institute; National Association of Manufacturers; National Mining Association; The Fertilizer Institute; and Utility Water Act Group.[1]

If the district court's novel and overreaching "conduit theory" of Clean Water Act ("CWA") liability stands, *amici*'s members could suddenly be required to obtain CWA Section 402 permits, known as National Pollutant Discharge Elimination System ("NPDES") permits, for activities that have never before been subject to such permitting.  Under that theory, an NPDES permit could be mandated any time pollutants are released from any structure that falls within the CWA's definition of "point source" (*e.g.*, pipes, containers, wells, channels, rolling

_____

[1] This brief is submitted with an accompanying motion for leave under Federal Rule of Appellate Procedure 29(b).  No party's counsel authored this brief in whole or in part.  No party, party's counsel, or other person, other than *amici curiae*, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

stock, etc.) and eventually reach a navigable water, irrespective of mode or duration of migration. Such an interpretation flies in the face of the CWA. As written, amended, implemented, and enforced in the decades since its inception, the CWA imposes liability only when point sources are the means by which pollutants reach navigable waters. Pollutants that reach navigable waters as the result of diffuse migration are left for states to address under nonpoint source control programs.

The "conduit theory" exposes *amici*'s members to a new threat of federal CWA liability and could unjustifiably impose significant new permitting burdens. Without warning, *amici*'s members may be both civilly and criminally liable for any pollutants released from the innumerable "point sources" under their control that might eventually find their way to navigable waters, whether by groundwater, air, surface runoff, or other means. Because even detailed technical studies may not provide a definitive answer as to whether a pollutant ultimately reaches a navigable water, *amici*'s members might apply for unnecessary NPDES permits simply to avoid potential, severe CWA penalties, thereby incurring significant expense, delay, and operational restrictions. By threatening to impose unprecedented liability to a wide swath of previously unpermitted sources, the

2

"conduit theory" could also cause the NPDES permitting program to balloon to an impracticable scale.

The district court's ruling pointedly ignored the fact that the manner in which pollutants reach navigable waters is critical to—and is indeed the crux of—the fundamental distinction Congress drew between point and nonpoint sources throughout the CWA. As such, *amici* seek its reversal as contrary to the Act's text, structure, and history.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Under the district court's "conduit theory," the CWA's NPDES requirements apply whenever two conditions are satisfied: (1) pollutants are released from some "point source," and (2) those pollutants eventually make their way to navigable waters, "regardless of *how* they get there." *Hawai'i Wildlife Fund v. County of Maui* ("*COM I*"), 24 F. Supp. 3d 980, 1000 (D. Haw. 2014); *see also Hawai'i Wildlife Fund v. County of Maui* ("*COM II*"), 2015 WL 328227, at *4-6 (D. Haw. Jan. 23, 2015). Ignoring the language of the statute, the district court determined that the conduit—groundwater—between the point sources (the County's injection wells) and the navigable waters (the Pacific Ocean) "need not [] be 'confined and discrete.'" *COM I*, 24 F. Supp. 3d at 999; *COM II*, 2015 WL 328227, at *4-5. It also found that the distance the pollutants had to migrate

3

through groundwater, as well as the "location and expanse of the pollutant's entry into the ocean," were irrelevant. *COM II*, 2015 WL 328227, at *6. The "conduit theory" marks an unprecedented expansion of the NPDES program, which has until now been understood to apply only to discharges for which the *point source itself* is the direct means by which a pollutant is added to navigable waters.[2]

The "conduit theory" cannot be reconciled with the text, structure, or history of the CWA. Throughout the Act, Congress purposefully distinguished between point sources and nonpoint sources of pollutants. Point sources are "discernible, confined, and discrete conveyance[s]" such as pipes that discharge channeled or collected fluids to navigable waters. 33 U.S.C. § 1362(14). Nonpoint sources, by contrast, release pollutants in a diffuse way (*e.g.*, wind dispersion, groundwater migration, or overland runoff) to a regulated water body.

---

[2] The "conduit theory" is separate from a narrower question that courts nationwide are split over: whether the CWA regulates discharges to groundwater that has a direct and immediate hydrological connection to navigable waters. *See* Appellant Br. at 35-37. Liability under the "conduit theory" would extend well beyond point source discharges to such groundwater. Moreover, the "conduit theory," as formulated by the district court, could encompass not just pollutants migrating through groundwater, but also windblown pollutants and pollutants in surface runoff.

4

NPDES requirements apply only to discharges of pollutants from point sources. *See id.* §§ 1311(a), 1342(a). The Act defines "discharge of a pollutant" as the "*addition* of any pollutant *to* navigable waters *from* any *point source*." *Id.* § 1362(12) (emphasis added). Those provisions are central to this case because, when read together, they make clear that NPDES requirements apply only where a "point source" is the means by which pollutants are added to navigable waters. When pollutants eventually reach navigable waters (as here) by means other than a discernible, confined, and discrete conveyance, there is no "discharge of a pollutant." Instead, there is only nonpoint source pollution.

Numerous cases from this Court and other circuits confirm that what differentiates point sources from nonpoint sources is the way in which pollutants reach navigable waters. *See, e.g.*, *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1153 (9th Cir. 2010). Both types of pollution ultimately reach navigable waters, so "*how* they get there" does matter. *See COM I*, 24 F. Supp. 3d at 1000. By ignoring this key distinction, the district court's "conduit theory" eviscerates the "clear and precise distinction" that Congress made between point sources that are subject to NPDES regulation and nonpoint sources that are subject to state and local nonpoint source management programs. S. Rep. No. 95-370, at 8 (1977).

5

Other provisions of the CWA likewise confirm that the "conduit theory" improperly expands the scope of the NPDES program to cover what Congress considered to be nonpoint sources of pollutants. Sections 304(f)(2) and 208(b)(2) refer specifically to the disposal of pollutants in wells and subsurface excavations as one of several specified nonpoint sources. *See* 33 U.S.C. §§ 1314(f)(2), 1288(b)(2). The legislative history for Section 304(f)(2), in particular, reflects that Congress was well aware of the potential for leaching and groundwater contamination from such wells and excavations. But rather than require NPDES permits for such disposals, the CWA vested authority in states and local governments to control any eventual pollution of navigable waters from such sources through nonpoint source management programs.

The district court could not "point to controlling appellate law or statutory text expressly allowing this theory in the present context." *COM I*, 24 F. Supp. 3d at 996. And no wonder—the CWA unambiguously forbids it. But even if this Court finds the Act ambiguous, it must, under the rule of lenity, construe that ambiguity in the County's favor. *See United States v. Granderson*, 511 U.S. 39, 54 (1994).

Beyond the legal infirmities, the practical consequences of the "conduit theory" are especially troubling. Under the "conduit theory," the NPDES program

6

could grow to unworkable proportions, with no meaningful limit on the number of sources it covers. Although this case involves diffuse migration of pollutants through groundwater, the "conduit theory" potentially implicates other means of diffuse migration, such as sheet runoff over land following rainfall or snowmelt, or windblown pollutants. Almost all pollutants that reach navigable waters through one of these diffuse methods can be traced back to some identifiable "point source," such as raw materials piles at an industrial facility, smokestacks, septic tanks, or stormwater infiltration and retention infrastructure. All are quintessential examples of nonpoint source pollution, long recognized by both the courts and EPA. But under the "conduit theory," they could require NPDES permits.

As further evidence of the preposterous nature of the "conduit theory," it is unlikely that NPDES requirements could even be applied to the types of "discharges" that may now become subject to permitting. Even assuming one were able to identify the various discharge points from which migrating pollutants reach navigable waters, access to conduct treatment, sampling, or monitoring would likely be impossible. The NPDES program's purpose was to address "end of pipe" discharges into navigable waters—it simply was not designed to regulate the type of seepage and diffuse migration implicated by the "conduit theory."

7

For all these reasons and those outlined below, this Court should reject the

district court's invented and untenable "conduit theory."

## ARGUMENT

## I.    The District Court's "Conduit Theory" Impermissibly Extends NPDES Requirements to Nonpoint Sources of Pollutants.

To determine the scope of the NPDES program, this Court applies the

"traditional tools of statutory construction . . . begin[ning] with the text and the

history of the statute." *Blandino-Medina v. Holder*, 712 F.3d 1338, 1343 (9th Cir.

2013). As explained below, Congress intended to subject only direct point source

discharges to federal regulation and oversight under the NPDES program—that is,

pollutants added to navigable waters from a discernible, confined, and discrete

conveyance. In contrast, Congress specifically gave states the authority to address

under their own programs nonpoint source abatement, including the control of

pollutants that migrate through groundwater and other diffuse means.

Under the district court's novel "conduit theory," an NPDES permit could be

required any time pollutants released from a point source migrate through

groundwater or other media, and eventually "find their way to" navigable waters.

*COM I*, 24 F. Supp. 3d at 996. NPDES requirements could apply no matter how

far those pollutants must migrate, no matter how diffuse that migration is, and no

matter how many days, weeks, months, or even years that migration takes. Such a

8

broad theory of liability impermissibly expands the scope of the NPDES program

to nonpoint sources.

**A.      Congress Plainly Distinguished Between Point Source Discharges Subject to the NPDES Program and Nonpoint Sources of Pollutants that are Addressed Under Other Programs.**

CWA Section 301 states that the "discharge of any pollutant [to a navigable

water] by any person shall be unlawful." 33 U.S.C. § 1311(a). Section 402

provides an important exception to this broad prohibition: EPA or a delegated state

may "issue a permit for the discharge of any pollutant" from a point source

"notwithstanding section 1311(a) of this title." *Id.* §§ 1342(a)(1), 1362(12)

(defining "discharge of any pollutant" to mean "any addition of any pollutant to

navigable waters from any point source"). A "point source" is "any discernible,

confined and discrete conveyance . . . from which pollutants are or may be

discharged." 33 U.S.C. § 1362(14). Sections 301 and 402, read along with the

pertinent statutory definitions,[3] demonstrate that NPDES permits are required only

_____

[3] Although Congress did not define "nonpoint source," that term generally refers to "pollution that does not result from the 'discharge' or 'addition' of pollutants from a point source." *See Or. Natural Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 n.9 (9th Cir. 1987).

9

for point source discharges. Nonpoint source pollution is not regulated under the CWA, but is instead addressed by other environmental programs.

The CWA thus draws a "clear and precise distinction between point sources, which [are] subject to direct Federal regulation, and nonpoint sources, control of which was specifically reserved to State and local governments through the section 208 process," S. Rep. No. 95-370, at 8 (1977), and section 319 nonpoint source management programs. *See* 33 U.S.C. §§ 1288, 1329; *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 785 (9th Cir. 2008) (explaining that nonpoint sources are "generally excluded from CWA regulations, except to the extent that states are encouraged to promote their own methods of tracking and targeting nonpoint source pollution."). The statute does not provide a "direct mechanism to control nonpoint source pollution but rather uses the 'threat and promise' of federal grants to the states to accomplish this task." *Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1097 (9th Cir. 1998). The statute further directs EPA to provide information to the states to aid in the control of nonpoint source pollution. *See* 33 U.S.C. § 1314(f).

Congress' "disparate treatment" of point source discharges and nonpoint source pollution is an "organizational paradigm of the Act." *Or. Natural Desert*

10

*Ass'n v. U.S. Forest Serv.*, 550 F.3d at 780.  The reasons for Congress' distinction are straightforward:

*First*, national uniformity in nonpoint source pollution control is "virtually impossible" given variations in climate and geography.  *Id.* at 785.

*Second*, because nonpoint source pollution abatement typically involves land use controls, Congress believed it best to leave such control "to the level of government closest to the sources of the problem," rather than authorizing federal regulatory authority.  S. Rep. No. 95-370, at 9.

*Third*, and related to the previous point, Congress recognized that "many nonpoint sources of pollution are beyond present technology of control."  S. Rep. No. 92-414, at 39 (1972); *see also* 117 Cong. Rec. 38,722, 38,825 (Nov. 2, 1971) (statement of Sen. Muskie) ("There is no effective way as yet, other than land use control, by which you can intercept [nonpoint] runoff and control it in the way that you do a point source.  We have not yet developed technology to deal with that kind of a problem").[4]

—————————————————

[4] Senator Muskie further observed that nonpoint source pollution, as distinguished from point source discharges, is "runoff into water that occurs perhaps miles away from the land that adjoins it."  117 Cong. Rec. at 38,825.

Congress knew that both point source discharges and nonpoint source pollution could impact water quality, but it nevertheless decided to address those different sources differently, requiring NPDES permits only for point source discharges to navigable waters.

### B.    The CWA Only Requires an NPDES Permit When Pollutants Reach Navigable Waters by Means of a Discernible, Confined, and Discrete Conveyance.

The "conduit theory" cannot be reconciled with the CWA's text, which subjects to NPDES regulation only a "discharge of a pollutant" that is itself the "*addition* of any pollutant *to* navigable waters *from* any *point source*."  33 U.S.C. § 1362(12) (emphasis added).  Diffuse migration of a pollutant to a navigable water—whether through groundwater or air, or over land—does not constitute an addition of a pollutant to a navigable water *from a point source*.  The mere fact that a pollutant was released from a "point source" sometime in the past and eventually finds its way to a navigable water is insufficient to constitute a covered discharge, because the term "discharge of a pollutant" requires that the "point source" itself be the actual or direct conveyance from which the pollutant is added to navigable waters.  Any other reading of the CWA's text would eliminate all meaningful differentiation between the terms "point source" and "nonpoint source," as nearly all nonpoint source pollution can be traced back to some conveyance, structure, or

12

area meeting the definition of "point source."  The method of addition to a

navigable water is the key distinction between the two.

Numerous circuits have recognized that the diffuse migration of pollutants

does not constitute a "discharge of a pollutant" subject to NPDES permitting, even

when some of the pollutants could be traced back to an identifiable structure or

facility that fits the definition of "point source."  Thus, for instance, this Court

previously held that when precipitation "seeps . . . into [mining] pits containing

waste rock" and "eventually enter[s] [a] surface water," it is nonpoint source

pollution.  *See Greater Yellowstone*, 628 F.3d at 1153.  There, the seepage had to

"filter[] through 200 feet of overburden and 250 to 750 feet of undisturbed material

beneath the overburden [before] eventually entering the surface water."  *Id.*

Because that seepage made its way to surface waters in a natural and unimpeded

manner, the Court held that it was not a point source discharge.  *See id.*

Likewise, in *Sierra Club v. Abston Const. Co., Inc.*, 620 F.2d 41, 44 (5th Cir.

1980), the Fifth Circuit rejected a theory of CWA liability that is nearly

indistinguishable from the district court's "conduit theory."  There, the plaintiff's

theory would merely have required "a showing of the original sources of the

pollution to find a statutory point source, *regardless of how the pollutant found its

way from that original source to the waterway*."  *Id.* (emphasis added).  Concerned

that such a theory could expand the scope of the NPDES program to encompass "the broad drainage of rainwater carrying oily pollutants from a road paralleling the waterway, or animal pollutants from a grazing field contiguous to the waterway," the Fifth Circuit rejected it, holding that "[t]he focus of this Act is on the 'discernible, confined and discrete' conveyance of the pollutant, which would exclude natural rainfall drainage over a broad area." *Id.*

Several other circuits have also recognized that a "discharge of a pollutant" only occurs when a point source directly adds a pollutant to navigable waters. The Second Circuit clarified that the term "'point source' [] does not necessarily refer to the place where the pollutant was created but rather refers only to the proximate source from which the pollutant is directly introduced to the destination water body." *Catskill Mountains v. City of New York*, 273 F.3d 481, 493 (2d Cir. 2001). The District of Columbia and Sixth Circuits similarly held that NPDES requirements apply only when a point source is the site at which a pollutant is first introduced into navigable waters. *See Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 584 (6th Cir. 1988); *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165, 175 (D.C. Cir. 1982). Thus, whether pollution is point or nonpoint source is determined at the point "when the pollutant first enters navigable water." *See Gorsuch*, 693 F.2d at 175. The D.C. Circuit further observed that Congress

14

could easily have chosen language that would have imposed NPDES requirements more broadly on "all pollution released through a point source." *See Gorsuch*, 693 F.2d at 176. Instead, Congress directed that "the NPDES system was limited to 'addition' of 'pollutants' 'from' a point source." *Id.* It is not enough to merely trace pollutants back to some release from a point source.

Together these cases expose the incurable flaw in the district court's "conduit theory." NPDES requirements do not apply merely because pollutants that ultimately reach navigable waters were at some point released from something that fits the definition of "point source"—a term that courts have interpreted expansively. *See United States v. Plaza Health Labs, Inc.*, 3 F.3d 643, 651 (2d Cir. 1993) (Oakes, J., dissenting) (listing examples illustrating how "courts have deemed a broad range of means of depositing pollutants in the country's navigable waters to be point sources"). Nearly all pollution that eventually reaches navigable waters likely could be traced back to something that might fairly be characterized as a "point source." But that cannot mean that all such pollution meets the statutory definition of "discharge of a pollutant." 33 U.S.C. § 1362(12). For there to be such a discharge, the "point source" must be the actual and direct means by which the pollutant is added to a navigable water. Otherwise, Congress' "clear and precise" distinction between point source discharges and nonpoint source pollution

15

would be rendered meaningless.  *See* S. Rep. No. 95-370, at 8.  Contrary to the

district court's belief, under the CWA it *does* matter how pollutants arrive at

navigable waters.  *See COM I*, 24 F. Supp. 3d at 1000.

By ignoring the means by which a pollutant enters a navigable water, the

"conduit theory" could result in the imposition of NPDES requirements not only

on diffuse migration of pollutants through groundwater, but also on "paradigmatic

examples of nonpoint source pollution" such as "runoff or windblown pollutants

from any identifiable source, whether channeled or not."  *Cordiano v. Metacon

Gun Club*, 575 F.3d 199, 224 (2d Cir. 2009).  This Court, however, has clarified

that "point sources and nonpoint sources are not distinguished by the kind of

pollution they create or by the activity causing the pollution, but rather by whether

the pollution reaches the water through a confined, discrete conveyance."  *Trs. for

Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984).  In other words, an

interpretation of the Act that turns solely on whether the release of pollutants from

a point source eventually reaches a navigable water "would eviscerate the point

source requirement and undo Congress' choice" to exclude things like diffuse

runoff and atmospheric deposition from the NPDES program.  *Cordiano*, 575 F.3d

at 224; *see also Alaska Cmty. Action on Toxics v. Aurora Energy Servs.*, 940 F.

Supp. 2d 1005, 1026 (D. Alaska 2013) ("a plaintiff seeking to establish a point

16

source discharge, even in the context of airborne pollution, must prove more than

that the pollutant originated from an identifiable source"; it must also "prove that

the pollutant reached the water through a confined, discrete conveyance"), *rev'd on*

*other grounds*, 765 F.3d 1169 (9th Cir. 2014).

In both *Cordiano* and *Aurora Energy*, windblown pollutants that ended up in

jurisdictional waters could be traced back to nearby structures that might in some

cases meet the definition of "point source,"[5] but the courts properly held that "wind

is the polar opposite of a 'discernible, confined and discrete conveyance.'" *Aurora*

*Energy*, 940 F. Supp. 2d at 1026-27. Under the "conduit theory," however,

NPDES permits could conceivably be required for windblown pollutants because

wind (like groundwater) serves as a conduit, and according to the district court,

conduits "need not also be 'confined and discrete.'" *COM I*, 24 F. Supp. 3d at 999.

---

[5] *Cordiano* involved an engineered earthen berm at the back of a shooting range
used for bullet containment, located "in close proximity" to wetlands. *See* 575
F.3d at 202, 223-24. *Aurora Energy* involved a coal loading facility's coal piles,
railcar unloader, and a stacker-reclaimer used to stack coal onto stockpiles and
reclaim coal from those piles to place it on a conveyer belt that carried the coal
over open water (Resurrection Bay in Seward, Alaska) to a ship loader. *See* 940
F. Supp. 2d at 1024-25.

Such an expansive interpretation of the Act is contrary to Congress' intent and the text of the CWA.

EPA's prior interpretations of the statutory distinction between point and nonpoint sources provide additional evidence that diffuse migration of pollutants is not subject to the NPDES program. *See* U.S. EPA, "What is Nonpoint Source?"[6] ("Nonpoint source pollution generally results from land runoff, precipitation, *atmospheric deposition*, drainage, *seepage* or hydrologic modification.") (emphasis added); *accord Cordiano*, 575 F.3d at 220-21 (quoting comparable descriptions of nonpoint source pollution from 1987, 1994, and 2003 EPA guidance documents and emphasizing EPA's view that such pollution can be "caused by rainfall or snowmelt moving over *and through the ground* and carrying natural and human-made pollutants," eventually depositing them in navigable waters) (emphasis added). These passages reflect EPA's recognition that *how* pollutants reach navigable waters is the critical distinction between point source discharges and nonpoint source pollutants.

---

[6] *Available at* http://www.epa.gov/polluted-runoff-nonpoint-source-pollution/what-nonpoint-source.

18

The district court here even acknowledged the absence of "controlling appellate law or statutory text expressly allowing" its novel "conduit theory." *COM I*, 24 F. Supp. 3d at 996.  Rather, as shown, the statutory text and controlling appellate law demonstrate the "conduit theory" rests on a flawed interpretation of the CWA.  The district court nevertheless adopted it because, in its view, it "makes sense to regulate groundwater."  *Id.*  The district court cannot override Congress' choice in this manner, no matter how reasonable the alternative may seem to it, and this Court must reverse.  "However sensible (or not) the [lower court's] position, a reviewing court's task is to apply the text of the statute, not to improve upon it." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1600 (2014); *see also FDA v. Brown & Williamson*, 529 U.S. 120, 161 (2000) ("In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop.").

### C.    Other Provisions of the CWA Confirm the NPDES Program Does Not Cover Diffuse Migration of Pollutants through Groundwater.

The statutory text shows Congress believed the types of pollution at issue here—pollutants that migrate to navigable waters following disposal in wells or subsurface excavations—are most appropriately addressed under the CWA's nonpoint source programs.  *See* 33 U.S.C. §§ 1288, 1314.  CWA Section 304(f),

which "concerns nonpoint sources of pollution," *see S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 106 (2004), requires EPA to provide technical information for states to use in their nonpoint source control programs, including "processes, procedures, and methods to control pollution resulting from . . . the disposal of pollutants in wells or in subsurface excavations." 33 U.S.C. § 1314(f)(2)(D).

The information EPA must provide under Section 304(f) "may range from provisions for evaluating geological characteristics of disposal sites to the costs and benefits of alternative methods of disposal." S. Rep. 92-414, at 53. Congress was well aware of the potential for "groundwater contamination" at "shallower disposal sites," which is why it called upon EPA to outline provisions "to control leaching of materials from such sites, which include land-fill sites as well as abandoned mines." *Id.*

Congress characterized "section [304(f)] and the information on such nonpoint sources [as] among the most important in the 1972 Amendments." H.R. Rep. No. 92-911, at 109 (1972). The various nonpoint sources identified in Section 304(f), including the disposal of pollutants in wells and subsurface excavations, also appear in Section 208(b)(2). *Compare* 33 U.S.C. § 1314(f) *with id.* § 1288(b)(2). Section 208, and later Section 319, "were designated by

20

Congress as methods to keep states accountable for identifying and tracking

nonpoint sources of pollution, as well as identifying 'the best management

practices and measures' to reduce such pollution." *Or. Natural Desert Ass'n*, 550

F.3d at 785.

When Congress left nonpoint source pollution control to the states, it

acknowledged that "Section 208, the 1972 act's laboratory for new institutional

control mechanisms for vexing nonpoint source problems . . . may not be

adequate." S. Rep. No. 95-370, at 10. Congress understood that states might resist

developing protective control measures, speculating that it "may be that sometime

in the future a Federal presence can be justified and afforded." *Id.* Congress

nevertheless concluded that "it is both necessary and appropriate to make a

distinction as to the kinds of activities that are to be regulated by the Federal

Government and the kinds of activities which are to be subject to some measure of

local control" under Section 208. *Id.*

That important distinction has remained in place for more than four decades.

And states, including Hawai'i, are indeed addressing various nonpoint sources of

21

pollutants under nonpoint source management plans.[7]  By vesting authority in the states to address nonpoint source pollution that eventually results from the disposal of pollutants into wells and subsurface excavations, Sections 304(f) and 208(b)(2) confirm that NPDES requirements were never intended to address such disposals. The district court erred by overriding the distinction that Congress intentionally drew between point and nonpoint source pollution and the disparate approaches Congress designated for addressing those types of pollution.

## II.  The CWA's Penalty Scheme Requires Rejection of the "Conduit Theory"

The CWA clearly forecloses the district court's "conduit theory."  But even if this Court finds ambiguity in the statute, it must construe that ambiguity in accordance with the rule of lenity and reject the "conduit theory."

The CWA imposes substantial criminal and civil penalties for violations. "Knowing" criminal violations are punishable by up to $100,000 per violation per day and six years' imprisonment, while negligent criminal violations carry fines of up to $50,000 per violation per day and two years' imprisonment.  33 U.S.C. §

_____

[7] *See* Hawai'i's Nonpoint Source Management Plan, 2015 to 2020, *available at* http://health.hawaii.gov/cwb/files/2013/05/2015-Hawaii-NPS-Management-Plan.pdf.

1319(c). Even first time criminal violations are punishable by fines of up to

$50,000 per violation per day and three years' imprisonment (for knowing

violations) or up to $25,000 per violation per day and one year in prison (for

negligent violations). *See id.* The CWA also provides for civil penalties in

enforcement actions by EPA or private citizens, which can be up to $37,500 per

violation. *See* 33 U.S.C. §§ 1319(d), 1365(a).

Criminal statutes like the CWA are subject to the rule of lenity and must be

narrowly construed. *See McNally v. United States*, 482 U.S. 350, 359-60 (1987)

("[W]hen there are two rational readings of a criminal statute, one harsher than the

other, we are to choose the harsher only when Congress has spoken in clear and

definite language."); *see also United States v. Bass*, 404 U.S. 336, 348 (1971)

(noting that "legislatures and not courts should define criminal activity"); *Plaza

Health Labs*, 3 F.3d at 649 (construing the term "point source" in accordance with

the rule of lenity and dismissing criminal prosecutions).

The rule of lenity serves three fundamental purposes: "to promote fair notice

to those subject to the criminal laws, to minimize the risk of selective or arbitrary

enforcement, and to maintain the proper balance between Congress, prosecutors,

and courts." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). This venerable

rule of statutory construction also applies in civil cases where a statutory provision,

such as CWA Section 402, has both criminal and civil applications.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1336 (2011) ("[T]he rule of lenity can apply when a statute with criminal sanctions is applied in a noncriminal context.").

Here, the district court's "conduit theory" leaves citizens uncertain about whether their operations and activities are punishable by harsh criminal and civil penalties because some amounts of pollutants may eventually reach navigable waters.  There is no way every landowner, business owner, operator, or independent contractor can ascertain whether its conduct might result in pollutants being carried from point sources under its control eventually to navigable waters via groundwater migration, wind dispersion, rainwater runoff, or other diffuse means outside of its control.  Such migration could occur over long periods of time and across vast geographic areas, and even detailed technical studies may not disclose whether their conduct might be considered a criminal discharge into a navigable water.  The rule of lenity exists to protect landowners against this very sort of uncertainty.

The district court's "conduit theory" exposes *amici*'s members and many other landowners and operators to potentially severe penalties based on an interpretation of the CWA that, by the court's admission, lacks any support in

24

controlling appellate law or the statute's text. If there is any ambiguity as to

whether the Act's text, structure, or history establishes that the "conduit theory"

rests on an "unambiguously correct" statutory interpretation, the rule of lenity

requires its rejection. *See Granderson*, 511 U.S. at 54.

III.   **The Practical Implications of the District Court's "Conduit Theory" Could Be Staggering.**

This Court should also reject the district court's "conduit theory" because it

may lead to impracticable results that Congress could not have intended when it

structured the CWA to make a clear distinction between point and nonpoint

sources of pollution. *See Ariz. State Bd. for Charter Schools v. U.S. Dep't of

Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) ("[W]ell-accepted rules of statutory

construction caution us that statutory interpretations which would produce absurd

results are to be avoided."); *United States v. Fejes*, 232 F.3d 696, 701 (9th Cir.

2000) (same).

A.   **Under the "Conduit Theory," the NPDES Program Could Grow to an Unworkable Scale.**

The "conduit theory" rests on an interpretation that effectively eliminates

Congress' distinction between point and nonpoint sources of pollution (*see supra*

Part I). Application of that theory risks triggering exactly the sort of administrative

permitting nightmare that Congress has averted by amending the CWA in the past,

25

even with respect to otherwise covered point source discharges. For instance, when Congress amended the Act in 1977 to expressly exempt from the NPDES program return flows from irrigated agriculture, it recognized that "[t]he problems of permitting every discrete source or conduit returning water to the streams from irrigated lands is simply too burdensome to place on the resources of EPA." *See* 123 Cong. Rec. 38,924, 38,956 (Dec. 15, 1977).

Likewise, when Congress amended the Act in 1987 to fundamentally change how stormwater discharges are regulated, it emphasized that permitting authorities must not be overwhelmed by having to permit every conceivable discharge of stormwater from a point source. *See, e.g.*, 131 Cong. Rec. 15,616, 15,657 (June 13, 1985) (declaring it "absurd" to "require everyone who has a device to divert, gather, or collect stormwater runoff and snowmelt to get a permit from EPA as a point source" and warning that such a permitting program "would be an administrative nightmare" and "would also be prohibitively expensive to administer"); 133 Cong. Rec. Daily H168, H170 (daily ed. Jan. 8, 1987) (explaining how the 1987 CWA amendments would "properly reduce the universe of permits required for storm water from millions to thousands" and how "local, State, and Federal officials would be inundated with an enormous permitting workload" without the amendments).

26

Both amendments were reactive.  Congress felt compelled to intervene when it saw how broadly courts and regulators were interpreting the NPDES provisions of the CWA.  Yet the administrative burdens Congress sought to avoid when it enacted those amendments pale in comparison to the burdens that could result from adoption of the district court's "conduit theory."  Much of what EPA and the courts have long considered to be nonpoint source pollution may suddenly be included in the NPDES program.  Indeed, there appears to be no meaningful limit to the number of sources that could require permits under the district court's impermissibly broad interpretation of the statute.

In particular, many treatment and pollution control measures (*e.g.*, green infrastructure) that landowners currently implement without NPDES permits could require such permits under the "conduit theory."  Runoff infiltration structures such as sumps, lagoons, and ponds that "are designed to capture a treatment volume of runoff and percolate it through surface soils into the ground water system" may require NPDES permits under the "conduit theory" if the pollutants ultimately migrate to navigable waters, which it should be noted, most groundwater does.  *See* U.S. EPA, *National Management Measures to Control*

27

*Nonpoint Source Pollution from Urban Areas*, at 5-9 (2005).[8]  Imposing NPDES

requirements on such facilities makes no sense given that EPA promotes their use

specifically to control *nonpoint* source pollution.  *See id.* at 5-9 to 5-10 (noting that

infiltration reduces runoff volumes and hence, peak flows in storm sewers and

downstream waters; filters out pollutants; and facilitates aquifer recharge, which is

vital to maintaining stream and wetland hydrology and ensuring survival of biota

in wetlands and streams).

Other structures and facilities that treat pollutants via soil percolation—such

as septic systems, which are ubiquitous in this country,[9] and spray irrigation (*i.e.*,

the disposal of treated municipal wastewater by application to fields, which allows

it to percolate through soil and recharge ground water)—might likewise become

subject to NPDES permitting under the "conduit theory."

---------------------------

[8] *Available at* https://www.epa.gov/polluted-runoff-nonpoint-source-pollution/urban-runoff-national-management-measures.

[9] There are over 21,000 septic tanks and 88,000 cesspools used for onsite disposal in Hawai'i alone, all of which have been considered nonpoint source pollution. *See* Hawai'i's Nonpoint Source Management Plan, 2015 to 2020, at 11-12, *available at* http://health.hawaii.gov/cwb/files/2013/05/2015-Hawaii-NPS-Management-Plan.pdf.

A broad range of storage structures and facilities are also at risk of being added to the NPDES program under the "conduit theory" to the extent any pollutants from those structures and facilities eventually migrate to navigable waters. For instance, aquifer recharge and aquifer storage and recovery projects involve the underground injection or infiltration of water via surface spreading, infiltration pits and basins, and injection wells. This can help prevent salt water intrusion into freshwater aquifers[10] and allow water to be stored and later recovered for uses such as drinking water supply, irrigation, or ecosystem restoration projects. Some of these projects are subject to Safe Drinking Water Act requirements for Class V wells, but not to NPDES requirements. Yet the "conduit theory" threatens to add duplicative or even inconsistent requirements.

State regulations with respect to pumping and recharging in the arid West often focus on preserving groundwater balances. As such, water originating below the surface is intentionally reinjected or reinfiltrated. By way of example, rapid

———————————————

[10] In coastal areas underlain by freshwater aquifers used for drinking water supply, freshwater is injected into the subsurface to create a barrier between saltwater and freshwater. The injected water creates a mixing zone of lower water quality which impedes the flow of saltwater into portions of the aquifer where freshwater well fields exist.

29

infiltration basins involve pumping water into a surface excavation and infiltrating it back into the groundwater, if necessary after pre-treatment to ensure compliance with drinking water and other water quality standards.  These structures, designed to maintain balanced groundwater resources, should not be subject to new and potentially conflicting regulatory requirements under the NPDES program.

Unlined impoundments are also used in numerous industries.  Examples include stormwater ponds, farm ponds, surface impoundments, cooling ponds, and water supply reservoirs.  Many of these structures do not currently require NPDES permits.  For those that do, the NPDES permits only address discharges of pollutants *directly* to surface waters, not the diffuse migration of pollutants from the unlined bottoms of those structures to navigable waters via soil and groundwater.  Owners and operators of those impoundments may need to seek new or modified permits and identify additional NPDES discharge points following the district court's opinion.  Likewise, pooling at the bottom of pits, such as gravel pits for highway repairs and road construction and mine pits, may newly face NPDES permitting requirements under the "conduit theory."

Because all that is required under the district court's "conduit theory" to trigger NPDES liability is the release of a pollutant from a "point source" and the eventual migration of that pollutant to a navigable water, hundreds of thousands (or

possibly millions) of additional NPDES permits could potentially be required

nationwide.  Congress could not have intended such an absurd result when it drew

sharp and meaningful distinctions between point and nonpoint source pollution

control throughout the CWA and preserved primary authority over land use for

state and local governments.

### B. NPDES Requirements Cannot Be Applied to the Sorts of Features that Would Require Permits Under the "Conduit Theory."

It is far from clear whether NPDES permitting requirements can even be

applied intelligibly to the litany of pollutant sources that the "conduit theory"

might bring into the NPDES program.  NPDES requirements were not designed

with diffuse pollutant migration in mind, much less methods to remove pollutants

through infiltration and percolation.  Rather, NPDES requirements were aimed at

"end-of-pipe" discharges directly into surface waters.  *See* U.S. EPA, *Overview of*

*the National Pollutant Discharge Elimination System (NPDES) Program*, at 16,

17, 23;[11] *see also* 40 C.F.R. § 122.45(a) (requiring that effluent limitations,

---------------------

[11] *Available at* http://www.epa.gov/sites/ production/files/2014-12/documents/
module-npdes.pdf.

31

standards and prohibitions be established "for each outfall or discharge point of the permitted facility").

For pollutants that migrate diffusely from a particular structure, facility, or land area via groundwater, it may not be possible to determine where the groundwater ultimately connects to a navigable water. Thus, there are no readily identifiable, defined outfalls or discharge points that can be used for purposes of calculating effluent limitations and conducting the required sampling and monitoring. *See* 40 C.F.R. Part 122 Subpart C. Nor would it make sense to simply declare that some aspect of a particular structure or facility (*e.g.*, the bottom of an unlined impoundment) is the discharge point. EPA's permitting guidance directs permit writers to require monitoring to determine compliance with applicable effluent limitations "after all treatment processes." U.S. EPA, *NPDES Permit Writer's Manual* § 8.1.2.3 (Sept. 2010).[12] Again, many infiltration structures and facilities are designed so that pollutant removal occurs during the movement through soil *after* the pollutants are released from the so-called discharge point.

---

[12] *Available at* https://www.epa.gov/npdes/npdes-permit-writers-manual.

32

Even assuming NPDES permit writers could somehow identify outfalls or discharge points, it may not be possible for the owner or operator of the "point source" to conduct the required sampling and monitoring because those locations may be miles away and beyond the owner or operator's control. To add to the uncertainty, at the point where groundwater containing pollutants that were released from a "point source" ultimately connects with a navigable water, that groundwater will likely contain pollutants from a host of other sources as well. Variable aspects of groundwater seepage such as flow rates and chemistry could further make applying NPDES regulations impracticable. For instance, unlike traditional "end of pipe" discharges, at various times of year flows can change and surface water can instead flow back into groundwater—a contingency that NPDES regulations do not account for.

In short, it would be impracticable, if not impossible, to apply NPDES requirements to the types of pollution that the "conduit theory" may reach. The permitting process would become even more burdensome and expensive for permit writers and applicants than it already is.

33

## **CONCLUSION**

The district court's "conduit theory" finds no support in the statute or law, and its application could make the NPDES permitting program unworkable. Accordingly, the district court's decisions should be reversed.

DATED this 28th day of March, 2016.

/s/ David Y. Chung
Kirsten L. Nathanson
Thomas A. Lorenzen
David Y. Chung
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 624-2500

34

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief contains

6,912 words and has been prepared in 14-point Times New Roman proportionally

spaced typeface.

/s/ David Y. Chung
David Y. Chung

35

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on March 28, 2016, I electronically filed a copy of the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit via the appellate CM/ECF system, which will send electronic notification of to all registered CM/ECF users in this case.

/s/ David Y .Chung
David Y. Chung

36